502

(Nos. 54282, 54365 cons.—

*In re* CUSTODY OF CHRISTY ELIZABETH TOWN-SEND (Brenda Poling *et al.*, Appellants; Gary Townsend, Appellee).

*Opinion filed October 21, 1981.*

504

Tim Eaton, of Baird, Latendresse, McCarthy & Rowden, of Decatur, for appellant Christy Townsend.

Burger, Fombelle, Wheeler & Dvorak, P.C., of Decatur, for appellant Brenda Poling.

Laurence W. Grabb, of Ryan, Grabb, Cini & Bennett, of Mattoon, for appellee.

MR. JUSTICE WARD delivered the opinion of the court:

This appeal involves a decision by the circuit court of Macon County awarding custody of Christy Elizabeth Townsend, a minor, to her half-sister, Brenda Poling, over the claim of Christy's natural father, Gary Townsend. The appellate court reversed and remanded with directions that custody be granted to Gary Townsend. (90 Ill. App. 3d 292.) We granted and consolidated for review separate petitions for leave to appeal filed by Brenda Poling and by special counsel appointed by the circuit court to represent the interests of Christy Townsend. 73 Ill. 2d R. 315(a).

That art does imitate nature may be illustrated by the remarkable circumstances of this appeal. During a period

of approximately two years, Gary Townsend and Dorothy Poling were involved in an extramarital relationship, and out of it a baby girl, who was named Christy Elizabeth Townsend, was born on October 14, 1976. In the latter part of this relationship, but prior to Christy's birth, it appears from the record that Dorothy had separated from her husband, George Poling, and was living by herself. Gary Townsend, during the relationship, was married and living in a single-family home in Shelbyville with his wife Judy and their son Alan, who was six years old in 1976. When Townsend was informed by Mrs. Poling that she was expecting his child, he asked his wife to agree not to contest a divorce proceeding. When she refused, Townsend left her and Alan and moved in with Dorothy. Soon after Dorothy's husband discovered that she was pregnant with Townsend's child, he filed for and obtained a divorce. After the divorce decree, Dorothy resumed the use of her maiden name, Dorothy Salmons, under which name she appears throughout the record of proceedings before us.

Townsend's and Salmons' living arrangement lasted for only three months, and with his wife assenting, he moved back into their family home in Shelbyville. Despite this separation from Dorothy, Gary continued to see her on a regular basis. As she was approaching the end of her pregnancy, Townsend received a phone call from her stating that she was in labor. He drove her to the hospital, where he acknowledged paternity and the child was named Christy Elizabeth Townsend. Upon leaving the hospital, Dorothy took custody of Christy and for a period of two years lived at what had been the Poling home with her 19-year-old daughter, Brenda Poling, who two months before Christy was born gave birth to an illegitimate baby girl, Courtney.

The record shows that Townsend, with his wife's knowledge, visited Dorothy and Christy two to three times a week during this period and that on many occasions he and

Dorothy had relations. As Christy was nearing two years of age, the relationship of Townsend and Dorothy began to pale and his visits became infrequent. This appeared to have disturbed Dorothy, who up to this time had continued to press Townsend to obtain a divorce. On December 10, 1978, two months after Christy's second birthday, Dorothy and the child arrived unannounced at the Townsend residence. It was the first time that Gary's son, Alan, had seen Christy, though he had been previously told by his father about her and the circumstances surrounding her birth. After acrimonious words were exchanged between Townsend and Dorothy, he asked her and the child to leave. The next day he drove to Dorothy's house and accused her of trying to upset his wife and son, particularly his son. Later that day Dorothy went to the Townsend residence and shot and killed Judy Townsend. Upon Dorothy's arrest, Christy was cared for by Dorothy's other daughter, Brenda Poling, who, shortly after the shooting, had moved into her father's two-bedroom trailer home. Several months later, Dorothy Salmons was tried and convicted of the murder of Judy and on May 2, 1979, was sentenced to a term of 30 years.

Immediately after Dorothy's conviction, Townsend attempted to learn where Christy was living. Though it appears he knew that Brenda had custody of the child, he seemingly did not know that Brenda, along with Christy and Courtney, had moved in with her father, George Poling. When he asked the State's Attorney's office for assistance in locating his daughter, Townsend testified that he was told only that she was being well cared for. On May 30, 1979, he filed a petition in the circuit court of Macon County alleging that, given the circumstances of Dorothy Salmons' conviction, it was in Christy's best interests that he be granted care, custody and control of his child. Brenda Poling, upon receiving the petition, filed a petition for leave to intervene, which on June 28 was granted. In her petition she alleged that Townsend was unfit to care for Christy;

that he failed to provide for her support; that he had abandoned interest in Christy's welfare; that he had not visited her for over six months; and that he never had custody, actual or legal, of Christy. She also filed a counter-petition for custody, claiming that since December 11, 1978, she had had sole custody of Christy; that they have formed a close relationship; and further that it was her mother's desire that she, Brenda, be granted custody of Christy. Various witnesses at the circuit court hearing testified to what they considered as desirable qualities and circumstances favoring each petitioner. Brenda's witnesses testified to a strong mother-daughter relationship between Brenda and Christy; that Christy was loved and treated well; and that when Brenda was at work as an assistant manager at a fast-food restaurant, Christy was taken care of by George Poling and other relatives. There was testimony that Christy and Brenda's daughter, Courtney, had formed a healthy sisterly relationship. The substance of this testimony was that Christy had become an integral member of a family unit in which she was loved, well cared for, and to which she had become strongly attached. Brenda also had maintained a relationship between Christy and her natural mother, Dorothy, by bringing her for weekly visits to the Dwight Correctional Center, where Dorothy was imprisoned.

Townsend's witnesses described him as a loving father who held a steady and well-paying job as a press operator with a substantial employer. He had been regularly attending church services in Shelbyville and participated in many church activities. Particular emphasis was placed upon the relationship between Townsend and his son Alan, which was described as excellent. Witnesses describe Alan as a normal, well-behaved and intelligent boy who loved and respected his father. It was testified that Alan had handled the death of his mother surprisingly well. Townsend stated that despite the fact that Christy's natural mother had killed his mother, Alan was looking forward to Christy's living

with his father and him. There was testimony that the child was not being cared for properly by Brenda.

Considering this and other testimony, the trial judge, though finding that both Townsend and Brenda were fit to care for Christy, held that it was in her best interests that custody be awarded to Brenda.

The above is an outline of the testimony presented at the hearing. It has not been necessary to point out all of the testimony presented or to detail it because of our conclusion that the trial court did not apply and give appropriate consideration to the relevant standards in awarding custody of Christy to her half-sister over the claim of her natural father.

In child-custody disputes it is an accepted presumption that the right or interest of a natural parent in the care, custody and control of a child is superior to the claim of a third person. The presumption is not absolute and serves only as one of several factors used by courts in resolving the ultimately controlling question of where the best interests of the child lie. (See *People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201; *Giacopelli v. Florence Crittenton Home* (1959), 16 Ill. 2d 556; *Cormack v. Marshall* (1904), 211 Ill. 519; *Halstead v. Halstead* (1966), 259 Iowa 526, 144 N.W.2d 861; Annot., 45 A.L.R.3d 216 (1972); Annot., 31 A.L.R.3d 1187 (1970).) A court need not find that the natural parent is unfit or has forfeited his custodial rights before awarding custody to another person if the best interests of the child will be served. (*People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201, 209; *Soldner v. Soldner* (1979), 69 Ill. App. 3d 97.) This standard or "guiding star" (*Nye v. Nye* (1952), 411 Ill. 408, 415) is a simple one designed to accommodate the often complex and unique circumstances of a particular case. The superior-right doctrine or presumption in favor of the natural parent, however, need not always be applied automatically in conjunction with the best-interestsof-the-child standard. For example, in a disso-

lution-of-marriage proceeding, the superior-right doctrine will not be applied where both the natural parents are seeking custody of their children. Instead each starts out on equal footing, with the court ultimately determining custody "in accordance with the best interest of the child" (Ill. Rev. Stat. 1979, ch. 40, par. 602(a)). Under the Adoption Act (Ill. Rev. Stat. 1979, ch. 40, par. 1501 *et seq.*), on the other hand, both the superior-right doctrine (see, *e.g., In re Woods* (1977), 54 Ill. App. 3d 729) and the best-interests standard are applied (*In re Abdullah* (1981), 85 Ill. 2d 300), though in this setting, a court, before permitting adoption by a third party, may not terminate all parental rights, including custody, unless the parent or parents consent or are found to be "unfit."

Here, of course, the proceeding does not involve a custody dispute incident to a divorce or an adoption proceeding, nor is the Juvenile Court Act applicable, which would require that the minor child be found to be delinquent, in need of supervision, or neglected or dependent before the child could be taken from the custody of its parents and made a ward of the State. See Ill. Rev. Stat. 1979, ch. 37, par. 702—1.

The right and correlative responsibility of a parent to care for his or her child is fundamental and as ancient as mankind. This basic human right and the superior-right doctrine find legislative expression in the Probate Act of 1975 (Ill. Rev. Stat. 1979, ch. 110½, par. 1—1 *et seq.*). Under article XI, entitled "Minors and Incompetents," section 11—7 provides:

"If both parents of a minor are living and are competent to transact their own business and are fit persons, they are entitled to the custody of the person of the minor and the direction of his education. If one parent is dead and the surviving parent is competent to transact his own business and is a fit person, he is similarly entitled. The parents have equal powers,

rights and duties concerning the minor. If the parents live apart, the court for good reason may award the custody and education of the minor to either parent or to some other person." Ill. Rev. Stat. 1979, ch. 110½, par. 11—7.

This court has acknowledged the operation of the superior-right doctrine within the context of the best-interests standard under this statutory provision. *People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201.

In a decision interpreting this section of the probate act, it was held that, in a custody dispute between a natural parent and a third person, the latter must demonstrate a "compelling reason" why the natural parent should not be granted custody of a child. (*Cebrzynski v. Cebrzysnki* (1978), 63 Ill. App. 3d 66, 72.) In another decision the court held that the third party must establish the parent's "unfit-ness" or otherwise show "good reason" to support a decision to deprive the parent of custody. (*Eaton v. Eaton* (1977), 50 Ill. App. 3d 306.) In other cases involving disputes between a natural parent and a child's grandparents where the court did not rely on section 11—7 as authority, it was held that the third party must show "convincing grounds" (*Soldner v. Soldner* (1979), 69 Ill. App. 3d 97, 102) or "cogent reasons" (*Look v. Look* (1974), 21 Ill. App. 3d 455, 457) to support a judge's award of custody to the third person over superior rights of the natural parent. The appellate court here reversed the circuit court's decision on the ground that no "compelling reason" had been demonstrated by Brenda to support an award of custody to her over the interest of Gary Townsend, the father of Christy.

This court's decision in *People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201, supports the view that a third party seeking to obtain or retain custody of a child over the superior right of the natural parent must demon-strate good cause or reason to overcome the presumption that a parent has a superior right to custody and further

must show that it is in the child's best interests that the third party be awarded the care, custody and control of the minor.

In *Livingston* the conduct of the father was radically distinguishable from the conduct of Townsend. The father there showed a complete indifference to his child's well-being. In that case there was a dispute between the natural father and the maternal grandfather of a 12-yearold boy, Roy, who was born in 1955. When he was 17 months old the father, Robert Edwards, left him with his mother. Up to that time the family had been living in the home of the mother's father, Alvin Livingston. There was no communication between Edwards and his wife until 1958, when he was granted a divorce on the grounds of desertion and adultery. The court ordered that Edwards pay $10 a week in child support, which he never paid. For the next nine years both the boy and his mother continued to live in her father's house. Edwards, during this time, never visited his son and sent him only one letter. It was not until 1967, when he attended the funeral of his former wife, who had died in July of that year, that he was re-introduced to his son. In September, Edwards filed a petition for writ of *habeas corpus* seeking custody of Roy from the child's grandfather. Edwards argued, relying upon the above-quoted provision of the probate act, that his right to the custody of Roy as his natural parent could not be overcome by Livingston unless he were found unfit or to have forfeited his right to custody. The court disagreed and held that "it is not necessary that the natural parent be found unfit or be found to have legally forfeited his rights to custody, if it is in the best interest of the child that he be placed in the custody of someone other than the natural parent. See *Giacopelli v. Florence Critten-ton Home*, 16 Ill. 2d 556; 67 C.J.S. Parent and Child sec. 11; 27 Am. Jur. Infants sec. 108; and also see *Halstead v. Halstead*, 259 Iowa 526, 144 N.W.2d 861." (42 Ill. 2d 201, 209.) The court said that a finding that the parent was fit

was only one factor a court was to consider and that the right of the parent to the custody of his or her child under the probate act "must yield to the best interest of the child even though the parent is a fit person." (42 Ill. 2d 201, 210.) *Giacopelli v. Florence Crittenton Home* (1959), 16 Ill. 2d 556, was cited by the court. In that case it was said that it is always recognized that a natural parent has a superior right to custody of his child. The court in *Livingston* went on, however, to show that there was good cause or reason to award custody to Livingston, the grandfather. This court described the complete abandonment by the petitioner Edwards of his interest in his child, saying:

"The appellee made no effort to visit his child after leaving the appellant's home until his wife died in July 1967, even though he never lived a greater distance than 30 miles from the boy. During the period from 1956 to 1967, the appellee never contributed to the support, education and welfare of the child. The record indicates that the appellee showed no interest in the welfare of the child for over 11 years and never assumed any of the responsibilities of a parent. The boy and he were strangers to each other. The child was apparently happy, well adjusted and had been properly developing in the environment of appellant's home. He had established, within limitations, a father-son relationship with the appellant. The evidence showed that the appellant's home afforded affection, understanding, guidance, security and a generally wholesome atmosphere. Dr. Cripe, the child psychiatrist, expressed the opinion that to remove the child from his environment would have a detrimental effect on his emotional and psychological well being." 42 Ill. 2d 201, 210-11.

The Supreme Court has recognized the primacy of a natural parent's right to the custody of the child. In *Stanley v. Illinois* (1972), 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208, the father of three illegitimate children who lived with

him and had been raised by him appealed from a judgment of this court that had upheld an Illinois statute which presumed that unwed fathers were unfit to care for their children. After dependency hearings were initiated by the State, Stanley's children were taken from his custody, made wards of the State, and placed with court-appointed guardians. In holding under the due process clause of the fourteenth amendment (U.S. Const., amend. XIV) that Stanley was entitled to a hearing on the question of his parental rights and his fitness, the court observed:

"The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection. It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements.' *Kovacs v. Cooper* [(1949), 336 U.S. 77, 95, 93 L. Ed. 513, 527, 69 S. Ct. 448, 458] (Frankfurter, J., concurring).

The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed 'essential,' *Meyer v. Nebraska* [(1923), 262 U.S. 390, 399, 67 L. Ed. 1042, 1045, 43 S. Ct. 625, 626], 'basic civil rights of man,' *Skinner v. Oklahoma* [(1942), 316 U.S. 535, 541, 86 L. Ed. 1655, 1660, 62 S. Ct. 1110, 1115], and '[r]ights far more precious . . . than property rights,' *May v. Andersen* [(1953), 345 U.S. 528, 533, 97 L. Ed. 1221, 1226, 73 S. Ct. 840, 843]. 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' *Prince v. Massachusetts* [(1944), 321 U.S. 158, 166, 88 L. Ed. 645, 652, 64 S. Ct. 438, 442]." 405 U.S. 645, 651, 31 L. Ed. 2d 551, 558-59, 92 S. Ct. 1208, 1212-13.

*Stanley,* and decisions in which the Supreme Court affirmed that the parent's right to custody is antecedent and superior, involved statutory proceedings attempting to block an unwed father's efforts to prevent the adoption of his children (*Caban v. Mohammed* (1979), 441 U.S. 380, 60 L. Ed. 2d 297, 99 S. Ct. 1760; *Quilloin v. Walcott* (1978), 434 U.S. 246, 54 L. Ed. 2d 511, 98 S. Ct. 549) and are distinguishable from the circumstances here. These holdings, however, make it clear that the interest of a parent in the care, custody and control of his or her child is fundamental and not to be ignored or facilely swept away in the face of a competing petition for custody filed by a third party. Here, Brenda bore the burden of demonstrating good cause or reason to supersede the superior right of Gary Townsend to the custody of his daughter and, further, that it was in Christy's best interest that Brenda retain custody of Townsend's child.

The trial judge erred at the very outset of the hearing in stating what would be the burden of Gary Townsend, Christy's father. Townsend's lawyer had argued to the court that a natural parent has, under our law, a superior right to custody and that a third person claiming custody would be required to show reason or cause why the child's best interests would be served by awarding custody to the third person. The trial judge's response was that that would be so only if the child was not in the custody of Brenda. It was clear that Christy was in the custody of Brenda, and the trial court held erroneously that the burden was on Townsend, the father. During argument at the conclusion of the hearing, the attorney who had been appointed by the court to represent the interest of Christy stated that where there had been no prior determination of the right to custody, neither the parent nor the other party had the burden of proof. The trial judge thereupon said: "I believe there is an equal burden" with respect to Brenda and Gary Townsend. This, too, was erroneous, as failing also to give appropriate

weight and consideration to Townsend's superior right as the natural parent.

It is obvious that in a custody dispute a court should give weight to the claim of a third person who has had actual or legal custody of the child for a substantial period of time, especially if the evidence shows that the child has become an integral member of a true family unit. (See generally *Halstead v. Halstead* (1966), 259 Iowa 526, 144 N.W.2d 861; *Look v. Look* (1974), 21 Ill. App. 3d 454.) But however important this factor may be in a given case, it does not rise to the level of a presumption so as to "neutralize" the superior-right doctrine or transpose the superior right from the natural parent to the third person. It remains simply a factor to consider in ascertaining what will best serve the interests of the child. Of course, in a given case it may be the determining factor in the custody decision. Though it is true that Towensend has never had actual and sole custody of his daughter, he did immediately seek custody upon the conviction of Christy's natural mother, Dorothy Salmons, when she was 2½ years old. At the time he filed his petition, Brenda had had sole custody for a period of only six months. That a considerable period of time has passed since Dorothy Salmons' conviction and since Brenda secured custody is attributable to the sometime pace of our judicial process, and not to any hesitation or delay on the part of Christy's natural father.

Unlike what would be true in the case of a custody dispute incident to a dissolution-of-marriage proceeding, the parties here did not start out on equal footing. The burden was on Brenda to establish good cause or reason to overcome the presumption that Townsend, as the natural father, had the first and superior right to the custody of his daughter. The trial court erred in failing to give this appropriate consideration.

For the reasons given, the judgments of the appellate and circuit courts are reversed and this cause is remanded to

the circuit court of Macon County for a hearing consistent with what has been expressed in this opinion. In the course of oral argument before us certain changes in the circumstances involved here came to light. These include the remarriage in prison of Dorothy Salmons and George Poling, the marriage of Brenda and the marriage of Gary Townsend to a woman with two minor children by a previous marriage. Whether Mrs. Townsend would welcome Christy into the new family group is an important question which must be determined. The court shall, where necessary, take further evidence and give appropriate consideration to it.

*Reversed and remanded.*

MR. JUSTICE SIMON, concurring in part and dissenting in part:

I find no good reason to further delay resolving Christy's custody by remanding this case for further hearings in the circuit court. Nor do I think it is in Christy's best interest to subject her to the "sometime pace of our judicial process" (as the majority puts it) (86 Ill. 2d at 515), which frequently takes an agonizingly long time. In custody cases especially, the courts should emphasize speedy resolution. Christy has just turned five. I do not think we should risk dragging out this case until she is six or seven before her permanent custody is settled; if, as I feel he should be, the father is awarded custody, it is in Christy's best interest to commence living with him as quickly as possible. My judgment is that we can better serve the interests of the child by reaching a decision on the record before us than by trying to dot every "i" and cross every "t" with further information which (as I demonstrate below) is really not needed. The father, Gary, has chosen to work "within the system," but he has been at it for 2½ years since he filed this case. That is sufficient time to decide under whose care Christy should live and show that "the system" can work expeditiously.

Both Christy's father and half-sister are fit to have custody, according to the trial judge. The majority says Gary has the advantage of the superior-right doctrine which the law attaches to a natural parent. I agree. The half-sister has shown no compelling reason why the natural parent should not have custody, as the majority says she must and with which I also agree. This should end the matter in the father's favor.

The majority suggests the importance of determining whether Gary's wife would welcome Christy into the new family group. I think this is answered by the fact that Gary has continued to seek Christy's custody after his remarriage by appealing this case to the appellate court and resisting Brenda's appeal to this court. It is unlikely that he would be persisting in this litigation if Mrs. Townsend objected to Christy becoming a part of her family.

The changes in Gary's life brought on by his remarriage appear to have improved his fitness to raise Christy. Brenda emphasized in this court as well as in the circuit and appellate courts that if Gary was given custody there would be a strained relation between his son Alan and Christy when they lived only with Gary, for Alan would resent the fact that Christy's mother had murdered his mother. Whether such resentment would develop is a matter of specula- tion; it is, in my judgment, less likely now that Christy and Alan would be living with a new mother figure (the new Mrs. Townsend) and her two minor children. I feel this setting is better for Christy than either living only with Gary and Alan or being taken care of by her mother's present and former husband, George Poling, and other relatives while the half-sister, Brenda, is at work.

This case has been in the courts since Christy was 2½ years old. In her best interest I think now is the time to end it by an order awarding custody to her natural father.

I might add that this case has arisen because of a deficiency in the statutes. The superior right of a natural

parent to the child is protected in proceedings under the Juvenile Court Act (Ill. Rev. Stat. 1979, ch. 37, par. 702—1) and the Adoption Act (Ill. Rev. Stat. 1979, ch. 40, par. 1501 *et seq.*) and is not at issue in custody proceedings under the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 602(a)). But the problem here arose because Christy Townsend was born an illegitimate. None of those acts applied, and the lower courts were forced to create a procedure and a standard for Gary's petition. All this court can find to guide it is a terse section from the Probate Act (Ill. Rev. Stat. 1979, ch. 110½, par. 11—7), despite the fact that neither parent is dead. The Paternity Act (Ill. Rev. Stat. 1979, ch. 40, par. 1351 *et seq.*) has provisions to protect the mother and child in cases like this, but there is no procedure by which a father can petition for custody of his child when the mother is alive but unavailable. There should be procedures in custody disputes like this to guide the court and protect the natural father's rights just as there are under the Juvenile Court Act and the Adoption Act. I commend the problem to the legislature and suggest that it consider adding custody directives to the Paternity Act.