In re PARENTAGE OF UNBORN CHILD BRUMFIELD (Brian Dean Brumfield, Petitioner-Appellee, v. Amy R. Yard, Respondent (Terry Dean Ginger et al., Third-Party Respondents-Appellants)).

Fourth District    No. 4—95—0500

Argued February 14, 1996.—Opinion filed November 22, 1996.

COOK, P.J., specially concurring.
KNECHT, J., dissenting.

Nick F. Burgrabe (argued), of Lincoln, for appellants.

Thomas W. Funk (argued), of Lincoln, for appellee.

JUSTICE GREEN delivered the opinion of the court:
This is another in a long line of cases involving disputes between one or both natural parents of a child and nonparents as to the custody of the child. This suit was brought under section 7 of the Parentage Act of 1984 (Parentage Act) (750 ILCS 45/7 (West 1992)). The dispute is part of a controversy which involves the complicated relationship between that legislation and the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/101 *et seq.* (West 1992)), the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 1992)), the Probate Act of 1975 (Probate Act) (755 ILCS 5/1—1 *et seq.* (West 1992)), the Juvenile Court Act of 1987 (Juvenile Act) (705 ILCS 405/

1—1 *et seq.* (West 1992)), and the proceedings for a writ of *habeas corpus* (735 ILCS 5/10—101 *et seq.* (West 1992)). In affirming this case, we believe that we and the circuit court have followed precedent.

On March 3, 1993, petitioner Brian Dean Brumfield filed this suit in the circuit court of Logan County against respondent Amy Yard seeking custody of an unborn child with which she was pregnant and of which he claimed he was the father. The petition was filed pursuant to section 7 of the Parentage Act and petitioner requested the establishment of a parent-child relationship with the child and an award of custody to him. He asked that the question of support be reserved. The child F.Y. was born on April 25, 1993, and on November 12, 1993, respondent executed an irrevocable consent for the adoption of F.Y.

Also on November 12, 1993, Terry Dean Ginger and Keri Jean Ginger, husband and wife, filed a petition in the circuit court of Christian County seeking to adopt F.Y. After petitioner was served with process in that proceeding, he filed a petition in this Parentage Act proceeding on November 23, 1993, requesting paternity blood testing (750 ILCS 45/11 (West 1992)). That request was granted, the necessary individuals submitted to blood tests, and when respondent failed to appear for a February 2, 1994, court date in the parentage case, the court entered an order defaulting her and declaring petitioner the father of F.Y. but reserving the questions of custody and child support. Although the Gingers were not then parties to the parentage case and had not yet sought intervention, for the purpose of the matters involved in this appeal, they do not dispute petitioner's paternity.

On February 22, 1994, the Gingers filed a petition to intervene in the parentage proceeding seeking to obtain custody of F.Y. and other relief. After an evidentiary hearing, the court allowed intervention on November 30, 1994, determining the Gingers had standing to intervene. Petitioner sought leave of this court to appeal that interlocutory order pursuant to Supreme Court Rule 308 (155 Ill. 2d R. 308). We denied the appeal. *In re Parentage of Brumfield*, No. 4—94—1076 (February 7, 1995) (leave to appeal denied). On April 6, 1995, after a hearing on petitioner's motion, the court reconsidered its ruling allowing intervention and denied intervention, on the basis that the Gingers lacked standing to seek custody of F.Y. The court then made a finding pursuant to Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)). The cited reason for the court's change was the recent highly publicized decision of the Supreme Court of Illinois in *In re Petition of Kirchner*, 164 Ill. 2d 468, 649 N.E.2d 324 (1995). The Gingers have appealed. We affirm.

Much of the evidence at the hearings on intervention was undisputed. Petitioner and respondent had been engaged and lived together for a period but separated in August 1992. Shortly thereafter, respondent learned she was pregnant and both she and petitioner believed petitioner was the father. After F.Y. was born, petitioner visited respondent and F.Y. in the hospital. For approximately the next seven months respondent and F.Y. lived with respondent's grandmother or in an apartment in Christian County. During this period, petitioner and respondent did not resume their romantic relationship but petitioner visited the baby almost every weekend and once F.Y. was about two months old, petitioner began taking her for overnight visits.

A dispute developed between petitioner and respondent as to whether petitioner kept the child too long on one visit and respondent made greater restrictions on petitioner's subsequent visits. However, petitioner continued to attempt to visit F.Y. every weekend and was permitted to do so approximately every other weekend until mid- or late-October 1993, when petitioner attempted a visit but was told by respondent that she had placed F.Y. with some relatives whose names she did not disclose. On November 3, 1993, respondent met with personnel of an office of the Illinois Department of Children and Family Services (DCFS), who had contacted Keri Ginger to be at the meeting. After that meeting, respondent brought F.Y. to Keri Ginger and left F.Y. with Keri telling her she and her husband, Dean, could adopt F.Y. The Gingers' filing of the adoption complaint in Christian County and the petition to intervene here followed.

■ Central to our decision is section 601(b)(2) of the Marriage Act, which states as follows:

"Jurisdiction—Commencement of Proceeding.
***
(b) A child custody proceeding is commenced in the court:

* * *

(2) by a person other than a parent, by filing a petition for custody of the child in the county in which he is permanently resident or found, but *only if he is not in the physical custody of one of his parents*." (Emphasis added.) 750 ILCS 5/601(b)(2) (West 1992).

The issues on appeal are (1) whether the requirements of section 601(b)(2) of the Marriage Act apply to proceedings under the Parentage Act; (2) if so, whether they apply to prospective intervenors as well as original parties; and (3) if both (1) and (2) are so, whether the Gingers proved that neither of F.Y.'s parents had "physical custody" of her at the time the Gingers sought to intervene.

■ If section 601(b)(2) of the Marriage Act was not applicable to this action, the Gingers should have been permitted to intervene. As the Parentage Act makes no express provision for intervention, the provisions of the Code of Civil Procedure (Code) (735 ILCS 5/2—408 (West 1992)) would ordinarily apply. *People ex rel. Yarn v. Yarn*, 73 Ill. App. 3d 454, 456, 392 N.E.2d 606, 607 (1979); *People ex rel. Mathis v. Brown*, 44 Ill. App. 3d 783, 786, 358 N.E.2d 1160, 1162 (1976). Section 2—408 of the Code permits intervention upon demonstration of a recognizable or enforceable interest in the litigation. 735 ILCS 5/2—408 (West 1992); *Maiter v. Chicago Board of Education*, 82 Ill. 2d 373, 382, 415 N.E.2d 1034, 1037 (1980); *Soyland Power Cooperative, Inc. v. Illinois Power Co.*, 213 Ill. App. 3d 916, 918-19, 572 N.E.2d 462, 464 (1991). If intervention on this basis were permissible, then the question of the custody of F.Y. would be decided under the standards of section 602(a) of the Marriage Act (750 ILCS 5/602(a) (West 1992)). The court would seek to determine F.Y.'s best interests after taking into consideration the strong preference given to the rights of a parent to the custody of his natural child (*In re Custody of Townsend*, 86 Ill. 2d 502, 514-15, 427 N.E.2d 1231, 1237-38 (1981)). However, as we will explain, we hold that section 601(b)(2) of the Marriage Act was applicable to this action.

■ As we also explain, we hold that the standing provisions embodied in section 601(b)(2) of the Marriage Act apply to those seeking custody under the Parentage Act regardless of whether they are intervenors or interested parties. If neither petitioner nor respondent had "physical custody" of F.Y. at the time intervention was sought, the Gingers would have been entitled to a hearing on custody under the *Townsend* standards. However, as we will explain, we hold that under supreme and appellate court decisions the phrase "physical custody" has been given a special meaning which required the circuit court to determine that petitioner had "physical custody" at the time intervention was sought and thus denied the Gingers standing to intervene.

In regard to the applicability of section 601(b)(2) of the Marriage Act to this case, we note that section 14(a)(1) of the Parentage Act states that a judgment thereunder "may contain provisions concerning the custody and guardianship of the child *** which the court shall determine in accordance with relevant factors set forth in the [Marriage Act] and any other applicable law of Illinois, to guide the court in a finding in the best interests of the child." 750 ILCS 45/14(a)(1) (West 1992). Section 14(a)(1), as amended, also states that "[i]n determining custody *** the court shall apply the relevant standards of [the Marriage Act]." 750 ILCS 45/14(a)(1) (West 1994) (as

amended by Pub. Act 88—538, § 10, eff. January 1, 1995 (1994 Ill. Laws 154, 158-59)).

In *Ligon v. Williams*, 264 Ill. App. 3d 701, 709, 637 N.E.2d 633, 639 (1994), the court stated that in proceedings under the Parentage Act, courts are "bound to consider custody determinations \*\*\* following the statutory guidelines in the [Marriage Act]." The language in *Ligon* was *dictum*, as that court determined the question of custody was not before it because the question was not raised by the pleadings in the circuit court. The *Ligon* opinion cited as guidelines to be followed those found in section 602 of the Marriage Act (750 ILCS 5/602 (West 1992)), which provide for a custody determination to be made on the basis of the best interests of the child involved. As *Ligon* was a dispute between parents, the standing requirement of section 601(b)(2) of the Marriage Act was not applicable.

The strongest reason why we hold that compliance with section 601(b)(2) of the Marriage Act was required of the Gingers here is the pervasive coverage given to section 601(b)(2) by the supreme court in *Kirchner*. There the natural father of a child born out of wedlock brought an original petition for writ of *habeas corpus* in that court. The court granted leave for filing the petition and after a hearing ordered the writ to issue. The respondents were persons with whom the mother had placed the child. The adoption of the child by those respondents had been set aside on appeal because of deception victimizing the petitioner. *In re Petition of Doe*, 159 Ill. 2d 347, 638 N.E.2d 181 (1994).

One of the basic reasons for allowing writ to issue in *Kirchner* was the determination that the child was in the "physical custody" of the father and thus the respondents lacked standing under section 601(b)(2) of the Marriage Act to seek custody of the child. If lack of standing under section 601(b)(2) can prevent nonparents from seeking to defend a *habeas corpus* action by seeking custody, it should also defeat an assertion by a nonparent in a request of a parent for custody in a suit under the Parentage Act.

Only a brief discussion is necessary on the question of whether the provisions of section 601(b)(2) of the Marriage Act apply to those seeking intervention in cases under the Parentage Act as well as to the parties. That section does apply to those who seek to intervene asking for custody in proceedings under the Marriage Act just as it applies to original parties. *In re Marriage of Carey*, 188 Ill. App. 3d 1040, 1046, 544 N.E.2d 1293, 1296 (1989); *In re Marriage of Nicholas*, 170 Ill. App. 3d 171, 176, 524 N.E.2d 728, 731 (1988). Logic requires a similar treatment in cases under the Parentage Act.

We now turn to the question of whether F.Y. was in the "physi-

cal custody" of petitioner at the time the Gingers filed their petition to intervene, thus denying them standing to seek her custody. Beginning with the case of *In re Custody of Peterson*, 112 Ill. 2d 48, 491 N.E.2d 1150 (1986), a special meaning has been given to the phrase "physical custody." In *Peterson*, the child's mother and father had divorced and, though both parents were found to be fit to have custody, the mother was awarded custody, with the father having visitation rights. *Peterson*, 112 Ill. 2d at 51, 491 N.E.2d at 1151.

In *Peterson*, the child and her mother lived with the mother's parents, who assisted the mother in caring for the child due to the mother's illness. The father lived nearby and exercised his visitation rights two days per week. When the mother eventually died of her illness, the grandparents petitioned for custody under the Marriage Act. The supreme court ultimately held that the circuit court properly dismissed the petition for lack of standing under section 601(b)(2) of the Marriage Act and properly granted custody to the father.

The *Peterson* court reasoned that as the mother had been in constant physical custody of the child and *the father had reasonably exercised his rights of visitation*, the father gained physical custody of the child upon the mother's death, thus barring the grandparents from having standing to seek custody. Here, neither natural parent has died but respondent's voluntary relinquishment of parental rights is analogous to the death of the mother in *Peterson*. Here, as in *Peterson*, the father has been vigorous in exercising his visitation and in proceeding without delay to obtain custody when the mother gave up possession.

The *Peterson* court stated that to allow physical *possession* to be the decisive factor on the standing issue would encourage abductions and contradict statutory intent. *Peterson*, 112 Ill. 2d at 53-54, 491 N.E.2d at 1152-53. The *Peterson* opinion explained that in *In re Custody of Barokas*, 109 Ill. App. 3d 536, 440 N.E.2d 1036 (1982), the appellate court had properly held that a child remained in the physical custody of her mother although the mother had placed the child in the temporary care of the child's adult sister who had turned the child over, without the mother's permission, to a third party. The opinion further explained that, on the other hand, in *In re Custody of Menconi*, 117 Ill. App. 3d 394, 453 N.E.2d 835 (1983), the appellate court had properly held that, in view of the voluntary transfer of possession and its extended duration, a father had indefinitely relinquished physical custody of his child when, after the mother's death, the paternal grandparents had cared for the child at the father's request for $6^1/2$ years.

The decision of the circuit court here is also supported by the decision in *Kirchner*. There, the father was abroad when the child was born and was told that the child died at birth but he vigorously attempted to find out if that was true. Upon learning of the existence of the child some two months after its birth, the father proceeded to assert his legal rights. In the meantime, he had married the mother. The child lived with the couple seeking adoption for over two years before the case reached the supreme court. In deciding the couple lacked standing under section 601(b)(2) of the Marriage Act, the supreme court first explained the constitutional rights of a parent, including unwed fathers who attempt to live up to their responsibilities. The United States Supreme Court cases beginning with *Stanley v. Illinois*, 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208 (1972), were listed.

The *Kirchner* court then explained that the "superior" right of the natural parent to the care, custody, and control of his child is the law of the land and is also embodied in Illinois statutory law. *Kirchner*, 164 Ill. 2d at 490, 649 N.E.2d at 334. *Peterson, Menconi*, and *Barokas* were cited. The court then stated that because section 601(b)(2) of the Marriage Act permits the vesting of custody of a child in a nonparent without showing the consent or unfitness of its parents, it should be interpreted narrowly. The court explained that "physical custody" requires more than physical possession. *Kirchner*, 164 Ill. 2d at 491, 649 N.E.2d at 335. The court noted the father had neither consented to placement of the child with those seeking adoption nor participated in it and that the conduct of the mother in that respect was not binding on him. Thus, the court concluded that "section 601(b)(2) cannot be invoked as against [the father] in the instant case because he has never voluntarily relinquished his right to the care, custody and control of his child" but had "exhibited sincere and vigorous interest in his child." *Kirchner*, 164 Ill. 2d at 493-94, 649 N.E.2d at 336.

The same could be said of the petitioner here. *Kirchner* is analogous to this case in that in both cases the child never lived with the father claiming "physical custody" but in each case the father has acted to protect his interest and to establish his relationship with the child. In neither case had the father been declared the father of the child when the child was placed with the persons seeking adoption. The diligence of petitioner here was greater than that of the father in *Kirchner* in that the father here brought suit for a declaration of paternity before the child was born and was available when the child was born and was in much better contact with the mother at that time. The Gingers were more straightforward than the persons seek-

ing adoption in *Kirchner* but they apparently did take possession of the child without having any contact with the father to determine his desires.

We recognize that even after *Peterson* the death of one parent does not necessarily automatically vest "physical custody" in the surviving parent. *Nicholas*, 170 Ill. App. 3d at 178, 524 N.E.2d at 733; *In re Custody of McCarthy*, 157 Ill. App. 3d 377, 383, 510 N.E.2d 555, 558 (1987). By the same token, the surrender of the "physical custody" by one parent possessing custody does not necessarily vest "physical custody" in the other parent. However, no cases have refuted the holdings in *Peterson* and *Kirchner* that when fathers in the position of petitioner here have acted as he and the father in *Kirchner* acted, their rights are protected under section 601(b)(2) of the Marriage Act. Because of the similarity of the situation of the father here and that in *Kirchner*, we need not attempt the hazardous task of attempting to set forth detailed standards in regard to when the conduct of a father of a child born out of wedlock results in a forfeiture of his rights of custody.

The Gingers present a thoughtful argument that allowing them to intervene and present a case for their custody under the theory of *Townsend* would be a better way to handle this situation. In *Townsend*, an action for custody was brought by a father of a daughter born out of wedlock against a nonparent who had physical possession of the child. At that time, no statute clearly governed the case and the supreme court concluded that the appropriate procedure there was for the trial court to consider the question of custody on the basis of the best interests of the child but with a rebuttable presumption in favor of the natural rights of the father. *Townsend*, 86 Ill. 2d at 514-15, 427 N.E.2d at 1238.

This procedure is similar to that which this court prescribed in *In re Marriage of Roberts*, 271 Ill. App. 3d 972, 649 N.E.2d 1344 (1995), but there the custody dispute was between a husband, who was later found not to be the biological father of a child, and a wife, who was the mother of the child. Section 601(b)(2) of the Marriage Act was deemed inapplicable because the husband was presumably the father of the child when the case started. The difficulty with considering that procedure here is that it is very much like the procedure suggested by Justice Miller in his dissent in *Kirchner* and necessarily rejected by the majority. *Kirchner*, 164 Ill. 2d at 508-09, 649 N.E.2d at 342-43.

Notably, after the decision in *Doe*, section 20b was added to the Adoption Act (Pub. Act 88—550, § 975, eff. July 3, 1994 (1994 Ill. Laws 368, 411)) to provide that after an adoption is vacated or a peti-

tion for adoption is denied, the court is to hold a prompt hearing in regard to the temporary and permanent custody of the child "pursuant to Part VI of [the Marriage Act]" with the child, the parents whose rights have not been terminated and "other parties who have been granted leave to intervene" as parties. 750 ILCS 50/20b (West 1994). The question of the application of section 601(b)(2) of the Marriage Act to those proceedings is not entirely clear.

■ One other contention of the Gingers must be briefly considered. On November 30, 1994, the circuit court allowed their petition for leave to intervene. Respondent sought leave to appeal that order to this court and we denied it. In March 1995, after our mandate issued, respondent filed a motion for reconsideration of the November 1994 order and the circuit court allowed that motion in April 1995, thus denying intervention. The Gingers maintain that the court lacked jurisdiction to reconsider the November 1994 order because more than 30 days had passed since its entry. This contention has no merit. The November 1994 order granting leave to intervene was not final as to all claims and all parties. Under the provisions of Supreme Court Rule 304(a), absent a finding required by that rule, such an order "is subject to revision at any time before the entry of a judgment adjudicating all the claims, rights, and liabilities of all the parties." 155 Ill. 2d R. 304(a).

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

PRESIDING JUSTICE COOK, specially concurring:

I agree with Justice Miller's dissent in *Kirchner* (164 Ill. 2d at 502-09, 649 N.E.2d at 340-43). A standing requirement is useful as a rough filter to prevent the filing of cases by those who have no legitimate interest in the care of the child, but is poorly suited to resolving real disputes between those who have such an interest. A standing requirement is unnecessary to protect the natural rights of the parent. Even where the court decides the case under the best-interest-of-the-child standard, the court will still give considerable weight to the right of the natural parent. The worst consequence of finding standing is that the court will hear evidence before deciding the case. Nevertheless, the majority opinion in *Kirchner* is binding upon us.

There is some justification for treating nonparents who wish to intervene in an existing case differently, for purposes of standing, than those who wish to file an original action. Section 601(b) of the Marriage Act provides that it applies when a child custody proceeding is "commenced." 750 ILCS 5/601(b) (West 1992). Section 601(c)

provides that "[t]he court, upon showing of good cause, may permit intervention of other interested parties." 750 ILCS 5/601(c) (West 1992). The comments to the section of the uniform act on which section 601 is based state:

"Once a custody proceeding is commenced, the court should be able to hear the views of all interested persons; [section 601(c) of the Marriage Act] therefore authorizes the judge to permit intervention by relatives who would not have been allowed to commence an action." Uniform Marriage and Divorce Act § 401, Comment, at 550-51, 9A U.L.A. (1987).

The cases, however, have not recognized that distinction. See, *e.g.*, *In re Marriage of Nicholas*, 170 Ill. App. 3d 171, 176, 524 N.E.2d 728, 731 (1988).

JUSTICE KNECHT, dissenting:

I respectfully dissent. The majority believes the *Kirchner* decision is controlling (164 Ill. 2d 468, 649 N.E.2d 324). I disagree. *Kirchner* involved an invalid adoption and allegations the adoptive parents deceived the biological father. The case before us involves a parentage proceeding and the request of F.Y.'s present caregivers to intervene in that proceeding. The majority emphasizes the similarity between this case and *Kirchner*. Yet, in this case, the child's mother voluntarily transferred F.Y. to the respondents, consented to the adoption of the child, and respondents promptly served notice on Brumfield of the adoption proceeding.

Justice Miller's dissent in *Kirchner* (164 Ill. 2d at 505, 649 N.E.2d at 341) makes several excellent points which, by analogy, are applicable in the case before us. Brumfield was not declared the biological father of F.Y. until *after* the child's mother voluntarily relinquished her parental rights and lawfully placed the child with a family she believed would give her daughter the care and love she deserved. The respondents filed an adoption petition and gave notice to the putative father. The Gingers were lawful custodians of F.Y. at that point. Brumfield had not yet been declared to be the child's father. He had not yet exercised custodial rights. Brief visits and the previous filing of a parentage petition did not give him the immediate and exclusive custody of F.Y. when Yard executed an irrevocable consent for adoption.

As noted by Justice Cook in his special concurrence, standing is a rough filter to screen out individuals who have no lawful or legitimate interest in a child. By what stretch of law, logic, fact or policy can it be said the Gingers do not have a sincere, legitimate and lawful interest in the welfare and custody of F.Y.?

The voluntary relinquishment requirement which has been engrafted by judicial decisions to section 601(b)(2) of the Marriage Act is not applicable here because Brumfield never had physical custody of F.Y. to relinquish. "The requirement of a voluntary relinquishment of the child by his or her biological parents is intended to discourage child abductions and other illicit self-help measures that would otherwise grant a third party standing pursuant to the literal terms of section 601(b)(2)." *Kirchner*, 164 Ill. 2d at 505, 649 N.E.2d at 341 (Miller, J., dissenting). The Gingers did not wrest control of F.Y. from Brumfield nor did Brumfield relinquish to them what he did not have. Brumfield had nothing to relinquish, and the Gingers have acted in good faith. The Gingers are not members of a roving band of child snatchers. They are not grasping relatives who seek to manage F.Y.'s estate. They did not abduct her. They did not engage in deceitful measures to prevent Brumfield from knowing they sought to adopt her. They have lawfully cared for and nurtured F.Y. since she was six months old and no reason exists to use an artificial and narrow interpretation of standing to prevent them from participating in the parentage proceeding and seeking custody of F.Y. They have standing—not because of "mere possession," but because of their good-faith conduct and their lawful exercise of authority and control over F.Y.'s welfare for almost 1 1/2 years before the trial court concluded it was required to deny their intervention.

Just as physical custody requires more than mere possession, so too does custody require more than mere biology. Fatherhood requires more than biology. Nurturing caregivers who are lawfully exercising control over a child cannot be dismissed as interlopers who have no interest in the future welfare of the child. "[B]iological relationships are not exclusive determination of the existence of a family." *Smith v. Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 843, 53 L. Ed. 2d 14, 34, 97 S. Ct. 2094, 2109 (1977).

Justice Cook in his special concurrence also notes the Uniform Marriage and Divorce Act, on which section 601(b)(2) is based, provides that relatives who would not have been permitted to commence a custody proceeding may nonetheless be permitted to intervene in an *existing* case. The wisdom of such an approach is contained in the true balance it achieves. Persons who have a prior relationship with a child and who have a legitimate interest in the child's welfare may be permitted to intervene, but a presumption in favor of the biological parent's claim will remain. This has the advantage of addressing both the child's welfare *and* the parent's interests instead of using a narrow view of standing to defeat a meaningful examination of the child's best interest.

The child's best interest controls when a custody dispute arises between natural parents. Yet, when such a dispute arises between a parent and a nonparent, we use a narrow interpretation of the standing requirement coupled with the superior right of a parent to the care and control of a child to prevent any inquiry into the child's welfare. In the face of the assertion a parent has a constitutional right to the custody of his child, perhaps we should ask why this right is superior to the child's interest in having the court carefully examine what is in the child's best interest. Why are they not equal claims? I am confident a more flexible approach to standing will not result in a plethora of neighbors and distant relatives snatching children from their parents and attempting to assert legal rights to their custody. I am also confident the trial courts can readily determine those persons who have a legitimate interest in the welfare of a child and permit them to participate in custody proceedings while at the same time giving appropriate deference to the parents' interests. Such an approach will not promote abductions or unilateral removals of children from their parents by interlopers or the state. It will promote the best interests of children.

The narrow application of standing in a case of this sort, while not intentional, unfortunately gives support to the notion that a child is the property of his parent. Melanie Sloan, in a thoughtful and provocative analysis of the infamous Baby Jessica case (*In re Baby Girl Clausen*, 442 Mich. 640, 502 N.W.2d 649 (1993)), the Parental Kidnapping Prevention Act (28 U.S.C.A. § 1738A (1988) (Prevention Act)), and other cases, posits that a child's right to live in a secure and loving environment is sometimes unfortunately subordinated to a parent's *ownership* interest in the child. M. Sloan, *No More Baby Jessicas: Proposed Revisions to the Parental Kidnapping Prevention Act*, 12 Yale L. & Pol'y Rev. 355 (1994) (hereinafter Sloan). The parental rights doctrine ultimately treats the child as a parent's property. That article proposes changes in the Prevention Act which parallel the concerns raised by Justice Miller in the *Kirchner* dissent and the approach taken by the Illinois legislature in the 1994 amendment adding section 20b to the Adoption Act (750 ILCS 50/20b (West 1994)). Best interest hearings may well be necessary before removing a child from the custody of adoptive parents and returning the child to biological parents.

Because parenthood is a social, psychological, and intentional status as much as it is a biological one, courts should have a flexible interpretation of standing to permit those who have social and psychological ties to a child and who have *chosen* to accept the responsibility of parenting, and actively intend to meet that

responsibility, to participate in court proceedings to determine custody. Sloan at 375. This approach places as much value on the child's welfare as it does on the parent's interests. Requiring a heretofore absent parent to articulate his claim to his daughter based on *her welfare*, rather than his own, expresses a genuine interest in the child as a person rather than a possession. See Sloan at 382. It also strikes a balance that cannot be achieved when the most significant people in the child's life are stopped at the courtroom door by a rule that serves the best interests of no one.