NOS. 4-05-0736, 4-05-0823 cons.      Filed:
3/28/06

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| In re: S.J., a Minor, | ) | Appeal from |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Circuit Court of |
|      Petitioner-Appellee, | ) | Champaign County |
|      v. (No. 4-05-0736) | ) | No. 03JA11 |
| MARK ROEMER, | ) | |
|      Respondent-Appellant. | ) | |
| ----------------------------------------------------------------- | ) | |
| In re: S.J., a Minor, | ) | |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
|      Petitioner-Appellee, | ) | |
|      v. (No. 4-05-0823) | ) | Honorable |
| KIM JOHNSON-SLATER, | ) | Holly F. Clemons, |
|      Respondent-Appellant. | ) | Judge Presiding. |

_____

JUSTICE COOK delivered the opinion of the court:

On August 30, 2005, the Champaign County circuit court entered an order placing custody and guardianship of S.J. (born January 30, 2003) with his foster mother, Debra Faulkner. Respondents, Kim Johnson-Slater and Mark Roemer, are S.J.'s biological parents, and each appealed the trial court's order. We reverse and remand.

I. BACKGROUND

On January 30, 2003, the State filed a petition for adjudication of wardship pertaining to S.J. The petition alleged that (1) S.J. was neglected when he resided with Kim and/or Marc Johnson (Kim's second husband) and/or Roemer in that the environment exposed S.J. to contact with a sexual predator, (2) S.J. was neglected when he resided with Kim and/or Marc Johnson and/or Roemer in that the environment exposed S.J. to risk of

sexual abuse, and (3) S.J. was neglected when he resided with Kim and/or Roemer in that Kim and Roemer have failed to correct the conditions that resulted in a prior adjudication of parental unfitness to exercise guardianship and/or custody of the minor's siblings.

When the petition was filed, Kim was married to but not residing with Marc Johnson, who had sexually abused her minor daughters, C.K. (born June 1, 1988), D'A.R. (born October 23, 1990), and A.R. (born September 7, 1991). Johnson admitted the abuse and was convicted and sentenced. Before Kim was married to Marc Johnson, she was married to Roemer. Roemer is the father of two of Kim's daughters, D'A.R. and A.R., and her two sons D.R. (born January 26, 1993) and S.J. Marc Johnson was originally listed as the presumptive father of S.J. as he was married to Kim at the time of S.J.'s birth. Genetic testing showed, though, that Roemer was S.J.'s father. Roemer had an indicated report in the past for sexual abuse of C.K., D'A.R., and A.R. but denies the abuse. When S.J. was born, Kim's four children had been removed from her care because she continued to allow Roemer and Marc Johnson to have contact with them despite the allegations of sexual abuse and because she failed to get appropriate counseling and treatment for her daughters after each man's abuse was discovered.

On April 2, 2003, at the adjudicatory hearing regarding S.J., Kim and Roemer stipulated to count III of the petition that S.J. was neglected because they failed to correct the conditions that were the basis of a prior finding of unfitness. A dis-positional hearing was held on May 5, 2003. On July 21, 2003, in its dispositional order, the trial court found it was in S.J.'s best interest that he be made a ward of the court and be adjudged neglected. Custody and guardianship of S.J. were placed with the Illinois Department of Children and Family Services (DCFS).

On September 24, 2003, the trial court entered a permanency hearing order with the goal for S.J. as substitute care pending determination of rights. On April 21, 2004, the trial court entered a permanency hearing order with the goal for S.J. as return home within five months. At a permanency hearing on July 21, 2004, the permanency goal for S.J. was substitute care pending status hearing. This continued to be the goal until after a permanency hearing on January 11, 2005, wherein the goal was again return home within five months.

On February 18, 2005, Debra Faulkner, S.J.'s foster parent since he was six days old, filed a petition to intervene under section 1-5(2)(d) of the Juvenile Court Act of 1987 (Juvenile Act) (705 ILCS 405/1-5(2)(d) (West 2004)). On March 15, 2005, the trial court granted Faulkner's petition, and the permanency hearing order for S.J. stated that the court was unable to identify a specific return-home date for S.J.

On March 18, 2005, Faulkner filed a motion for a bonding assessment. On March 24, 2005, the trial court determined that such an assessment was in S.J.'s best interest. Faulkner paid for the assessment. On June 8, 2005, Dr. Judy Osgood, a licensed psychologist, completed a bonding assessment that recommended that S.J. remain with Faulkner and her children. In the assessment, Dr. Osgood concluded S.J. had "developed an extremely strong and loving bond with [Faulkner] that is typically seen with a child who has lived his life with a very loving and stable parent." Further, Dr. Osgood stated S.J.'s "reality" is that Faulkner is "mommy." Dr. Osgood stated S.J. is

> "at high risk for the development of a Reactive
> Attachment Disorder (RAD) and Post-traumatic Stress
> Disorder (PTSD) as a result of the potential separation

from the mother he has known and experienced all his life as his primary attachment figure/caregiver, Debbie Faulkner. [S.J.'s] bond and attachment to Debbie appears to be in response to the fact that [S.J.] has lived with Debbie Faulkner throughout his life (since six days old) and is now two years, four months old and reflects the love, nurturing, safety[,] and stability Debbie has provided."

A permanency review hearing was held June 21, 2005, and continued on July 5, July 19, July 28, and August 29, 2005. At those hearings the following evidence was presented.

Dr. Osgood testified that she first contacted the guardian ad litem (GAL), now the attorney for the minors, for all of Kim's children to ask for reports and records of the case. Dr. Osgood stated after doing the assessment, she formed an opinion as to with whom S.J. should reside based on S.J.'s attachments to Kim, Roemer, and Faulkner; the impact of a disruption upon S.J.; S.J.'s long-term emotional and psychological needs; and S.J.'s age. According to Dr. Osgood, research indicates that when a relationship between a child of S.J.'s age (a little more than two at this hearing) with a primary caregiver is disrupted, the young child can develop trust issues that may inhibit development of his own personality and his ability to form relationships. Besides relying on research, Dr. Osgood observed S.J. with Faulkner, Kim, his biological siblings, the children in Faulkner's home, and Roemer. Dr. Osgood was alarmed at S.J.'s visitation schedule, wherein S.J. spent every weekend unsupervised with Kim, visited weekly with Roemer, and visited weekly with

4

his biological siblings. Also, Dr. Osgood was worried because, since S.J. began unsupervised weekend visits with Kim, S.J. calls everyone mommy and daddy regardless of the person's gender. Further, S.J. has, according to reports from Faulkner, experienced some sleep problems. To Dr. Osgood, all of the disruptions and transitions for S.J., the mommy-daddy confusion, and the sleep problems indicate adjustment problems. Dr. Osgood worried that the visitation schedule disrupted S.J.'s relationship with his primary caregiver and attachment figure, Faulkner.

Dr. Osgood determined that the bond between S.J. and Faulkner is that he sees her as his primary attachment figure and goes to her for comfort and security. As to the bond with Kim, S.J. feels secure with her, but he does not demonstrate the same security and seeking of comfort with her that he does with Faulkner. Dr. Osgood analogized S.J. and Kim's relationship with that of a nephew and a familiar aunt. As for S.J.'s relationship with Roemer, S.J. is attached to Roemer much in the same way, if not more so, as he is to Kim. Dr. Osgood was concerned with Roemer's parenting, though, because he did not provide the parenting interventions S.J. needed to stay safe. She cited a few times that she observed Roemer's lack of intervention. One example of Roemer's lack of intervention is the time S.J. was chewing on a stick in the park and Roemer's mother had to tell him to tell S.J. to stop.

If S.J. were removed from Faulkner's care, Dr. Osgood concluded the number one effect and risk factor is that S.J. will be removed from the person he perceives as mommy. Taking S.J. from Faulkner would be no different than taking any other 2 1/2-year-old from his mother. Dr. Osgood was concerned that S.J. is already demonstrating symptoms of RAD in that he is confused as to who is mommy and daddy. S.J. has

sometimes walked up to strange men and called them daddy. This confusion can affect current relationships, a child's personality, and a child's ability to trust. Dr. Osgood, therefore, opined that continuing to reside with Faulkner would be in S.J.'s best interest emotionally, psychologically, and developmentally. With respect to visitation with Kim and S.J.'s biological siblings, Dr. Osgood determined that once a month S.J. should visit with them for eight hours. As for visitation with Roemer, Dr. Osgood recommended visitation once a month for two hours with supervision by someone other than Roemer's mother, as she defended Roemer when sexual-abuse charges were made. Further, Dr. Osgood stated supervision would be necessary because of Roemer's history of anger and domestic violence, specifically Kim's charge that S.J. was conceived when Roemer raped her.

The following was elicited during cross-examinations of Dr. Osgood.

Kim's attorney first established that for the assessment, Dr. Osgood spent more time doing observations and interviews on Faulkner and S.J. as opposed to S.J. and his biological parents. Dr. Osgood was aware that Kim attended counseling with Joanna Kling and read reports from Kling up to March 2005, but did not contact Kling. Dr. Osgood did not feel Kim presented any safety risk to S.J. and felt Kim was appropriate with him and took adequate care of him. As for S.J.'s relationship with his siblings, Dr. Osgood stated losing the siblings he knows through Faulkner would be more of a loss to him than spending less time with his biological siblings. S.J.'s biological siblings are much older than his Faulkner siblings, and he has lived with his Faulkner siblings his whole life and only visited his biological siblings.

Roemer's attorney established that Dr. Osgood spent more time observing S.J. with Faulkner and interviewing Faulkner than she did with either Kim or Roemer. Dr.

Osgood did agree that S.J. had an attachment with Roemer. Concerning Dr. Osgood's contact with the GAL, now the attorney for the minors, she stated she asked him what the law was in Illinois so she would know whether her recommendation is allowable under the law.

During the State's cross-examination, Dr. Osgood testified that RAD is a significant and severe diagnosis and, if it is fully manifested in a child, that child may never completely recover. PTSD symptoms can worsen if left untreated. Both RAD and PTSD can have long-term effects that inhibit a person's ability to function in everyday life. In terms of each of the parties' ability to empathize with S.J., Dr. Osgood stated Faulkner was able to empathize with and interact appropriately with S.J., as was Kim. Kim's current husband, Ken, acted appropriately with S.J., and many times S.J. appeared to seek out Ken more than Kim. Dr. Osgood had concerns with Kim because S.J. at times rejected her attempts to comfort him and Kim's past refusal to get counseling for her abused daughters demonstrates a lack of empathy for children. As for Roemer, Dr. Osgood stated he is able to provide some empathy, but he lacks an ability to really understand some of S.J.'s needs.

The current GAL established that the visitation plan envisioned by Dr. Osgood, in which S.J. visits with his biological family once a month, would remain in effect until S.J. is around the age of five and developmentally prepared for increased visits. In Dr. Osgood's vision, at this point, the biological family may request that S.J. accompany them to family reunions or join them in holiday festivities. Dr. Osgood recommended someone mediate the contact between Faulkner and Kim to help reduce conflict for S.J. If S.J. were to move in with Kim, Dr. Osgood states his chance of developing RAD would lessen if he were to maintain contact with Faulkner.

The attorney for the minors (the former GAL) established that S.J.'s primary bond is with Faulkner and that, aside from RAD, losing her will cause a tremendous loss to S.J. and cause him emotional pain that he will not be able to understand for a long time. S.J. would need professional assistance even if he does not develop RAD. S.J. cannot understand that Faulkner is not his mother, and the earliest age he would be able to comprehend his situation would be age five or six. S.J. would likewise suffer a loss if he lost his biological siblings or his siblings with Faulkner. Dr. Osgood stated nothing and no one can change S.J.'s perception of Faulkner as his primary attachment.

Joanna Kling next testified on Kim's behalf. Kling is Kim's therapist and has been her therapist since S.J. was born. Kling had observed Kim with S.J. twice for 30 to 50 minutes each time and reported that the two seemed very comfortable together and S.J. responded to Kim as a child would respond to his mother. Kling felt Kim could deal with S.J. appropriately. For the past six months, Kling conducted family therapy with Kim, her husband, and Kim's older children. Once Kling got all of the information about Kim's situation, about two years ago, Kling formed the opinion that returning the children to their mother would be in the children's best interests.

Joanne Radcliffe, the court-appointed special advocate (CASA) in this case, testified that S.J. appeared to be comfortable and bonded with Kim and his biological siblings. Radcliffe stated Kim adequately cared for S.J. If S.J. were returned home, Radcliffe believed he would benefit from his large extended family. Radcliffe disagreed with Dr. Osgood's recommendations. As the current GAL for all of the children, Radcliffe spoke with Kim's older children and they stated they wanted their little brother to live with them and their mother.

S.J.'s current caseworker from Lutheran Social Services, Christy Thompson, took over S.J.'s case in December 2004. Thompson supervised all visits when she took over the case until, in June 2005, S.J. began visiting with Roemer under the supervision of Roemer's mother and, in March 2005, S.J. began visiting with Kim unsupervised. Thompson stopped by, though, during some of Kim's unsupervised visits. Thompson also transported S.J. between Faulkner's and Kim's houses for visits. When S.J. left Kim, he screamed and yelled, but he would settle down when Thompson told him where they were going. Also, when S.J. left Faulkner, he would scream and yell. S.J. was always excited to see Faulkner when he returned from a visit with Kim. When Thompson observed S.J. and Kim, she noted a loving relationship in which Kim interacted well with S.J. and S.J. responded lovingly to her. Thompson also noticed S.J. and Faulkner had a close relationship. When S.J. visited Roemer, he would get excited and would not let Roemer out of his sight. Thompson describes S.J.'s relationship with Roemer as loving and father-and-son-like. S.J.'s reaction when leaving Roemer was the same as when he left Kim or Faulkner. Thompson testified her agency's goal for S.J. has been return home to Kim and she continues to support that recommendation.

James Forrest, a child-welfare specialist for DCFS, testified he monitors Lutheran Social Services' compliance with DCFS regulations and procedures. He stated he does not know of any licensing complaints against Faulkner. Forrest later testified that DCFS's goal for S.J. is return home and, if the trial court chose to continue its prior orders, DCFS would return S.J. home because Kim has been found to have made reasonable efforts and progress.

Carol Lichtensteiger is the respite-care provider for Faulkner. She stated she

provided respite care less than the amount of time allowed by DCFS but does help out during the days. She noted that, since the unsupervised visits with Kim, S.J. began questioning if Faulkner would come back to get him when he was left with her. She also stated he had trouble sleeping during two recent overnight visits. Carol observed S.J. act unusually aggressive at a recent afternoon visit.

Roemer's mother, Joy Maltby, testified that Roemer lives with her. She was with Roemer during all of his visits with S.J. and noted S.J. was always happy to visit Roemer.

Roemer's attorney then called Faulkner to testify. Faulkner admitted that the police had been called to her residence twice in the summer of 2003. The police were called once because an ex-girlfriend of her former boyfriend was continuously calling Faulkner's house. Faulkner stated S.J.'s oldest sister, C.K., lived with her and S.J. for a period of time. C.K. would sometimes watch S.J. when Faulkner was out.

C.K., Kim's oldest daughter and S.J.'s half-sister, testified that she resided in Faulkner's foster home for over a year. During C.K.'s stay, the only other adults that lived in Faulkner's home were Faulkner's former husband Roger, who left when they divorced, and Faulkner's former boyfriend, Mark, who left when they broke up. C.K. claimed she was left to care for the younger children in the home quite often. C.K. would babysit on weekend nights while Faulkner was out with friends and during the day in the summer. C.K. stated she left Faulkner's home because she had disagreements with Faulkner. While C.K. was at Faulkner's home, Faulkner's former boyfriend came over drunk on Thanksgiving, threw a wine bottle at C.K., and tried to hit C.K. and Faulkner, so Faulkner called the police. C.K. also stated Faulkner used alcohol every day, drinking around three bottles of beer a day.

C.K. saw Faulkner drunk on some weekends, and C.K. would watch S.J. when Faulkner was drunk on the weekends. C.K. admitted, though, that Faulkner cared for S.J. as if he were her own son. C.K. also admitted that when she first lived with Faulkner, she was very close to her and called her mom. C.K. had wanted her biological mother's rights to be terminated so she could be adopted by Faulkner. Two months before C.K. left Faulkner's, "things between them got bad." Counsel stipulated to the fact that Faulkner was alleging that C.K. was bringing a young man into the house at night without permission and engaging in inappropriate sexual activity with that young man and other young men. Further, C.K. was inappropriately contacting people on the Internet. These occurrences led to Faulkner's and C.K.'s request that C.K. be removed from Faulkner's home. C.K. admitted she felt hurt about the breakdown of her and Faulkner's relationship.

A.R. testified next and stated she thinks S.J. should live with her and her mother, Kim. A.R. stated S.J. gets along well with both Kim and Roemer. A.R. lived with Faulkner for about seven months and never saw her drunk. A.R. never saw Faulkner drink except for wine on New Year's Eve. The only beer she saw consumed was by Faulkner's ex-husband or former boyfriend. Faulkner had a bedtime for the children, even on weekends, and Faulkner would personally enforce the bedtime except when she was at the store. When Faulkner was at the store, C.K. would enforce the bedtime.

D'A.R. testified that S.J. should live with his family so that he knows his family. D'A.R. also lived with Faulkner for a short time. She observed that Faulkner's former boyfriend had a drinking problem, but that she only knew Faulkner to drink in her bedroom with the former boyfriend. Faulkner did not drink much around S.J. While D'A.R. lived with Faulkner, C.K. only watched them when Faulkner had to go to work or do errands, but not a

lot.  When Faulkner broke up with her boyfriend, she stopped going out on weekends.

D.R. testified he thought S.J. should live with Kim, even though he wanted to live with his dad because his dad is a man and he wanted to get away from the women in his life.

Roemer testified that S.J. is always happy to see him.  Roemer also denied S.J. was conceived as a result of rape.  Roemer admitted visiting with his children with Kim's blessing after the divorce, despite the order in the divorce decree that he was not to have contact with the children.

At the close of all of the evidence and after arguments by counsel, the trial court determined that Kim was fit, able, and willing to exercise care, custody, and control of D'A.R., A.R., and D.R.  As to C.K., Kim was deemed unable as she had not been able to mend the damage in her relationship with C.K.  C.K. was to remain in DCFS care with the continued goal of substitute care pending independence.  As for Roemer and his three oldest children, the court deemed him unable to care for, protect, train, and discipline the children.

As for S.J., the trial court found it was in S.J.'s best interest that his custody and guardianship be placed with Faulkner.  The court found Dr. Osgood's testimony to be very credible.  The court further determined that Faulkner has provided S.J. with a loving environment and he has thrived in her care.  While recognizing S.J.'s ties with his biological siblings, the court determined loss of his younger Faulkner siblings would have a greater impact.  The court advanced reservations about Kim's ability to care for S.J. long term based on her history.  As for Roemer, the court was concerned about his abusive past.

Ultimately, the trial court stated as follows:

"In light of the concerns expressed by Dr. Osgood regarding the risk of development of [RAD] and [PTSD] if [S.J.] is removed from Ms. Faulkner's care, and in light of the concerns the [c]ourt has as to the [r]espondent parents and also in light of [S.J.'s] very positive growth and development in Ms. Faulkner's home, the [c]ourt finds that it is going to be in [S.J.'s] best interest that his custody and guardianship be placed with Ms. Faulkner."

The court stated visitation between Kim, Roemer, and S.J. should be consistent with Dr. Osgood's recommendations, except that Roemer's mother could continue to supervise. The court then reviewed appellate rights with Roemer. Kim's counsel stated he would review those rights with her as she had left the courtroom. Kim and Roemer filed separate notices of appeal from the trial court's order, and we have consolidated the cases for decision.

## II. ANALYSIS

This case involves the permanency placement of a child absent a termination of parental rights. Respondents, Kim and Roemer, allege that the trial court's finding that it was in S.J.'s best interest to transfer custody and guardianship of S.J. to his foster parent, Faulkner, was against the manifest weight of the evidence.

The State initially responds that this court has appellate jurisdiction despite the fact that the order being appealed is a permanency order. The State argues this permanency order is analogous to the permanency order in In re Faith B., 216 Ill. 2d 1, 832 N.E.2d 152 (2005), wherein an order setting private guardianship as a permanency goal was determined to be a final order for purposes of appeal. In Faith B., the court determined the permanency order was atypical for several reasons: (1) it was entered as part of a

dispositional order that the circuit court stated was final and appealable, (2) the circuit court declined to set any subsequent permanency hearings, (3) the trial judge indicated the court believed the only acceptable plan in this case was guardianship by the aunts, and (4) the goal the court set was achieved as soon as the court set it and there was no time during which the goal remained open and subject to modification. Faith B., 216 Ill. 2d at 17, 832 N.E.2d at 161. The State argues this case is similar in that the trial court considered the order to be appealable, the court set a review hearing as opposed to a permanency review hearing, and once the court placed custody and guardianship with Faulkner, the permanency goal was achieved, leaving the court with nothing left to do. We agree with the State and proceed to review this case on the merits.

When reviewing the trial court's best-interest determination, the reviewing court will not overturn the court's determination unless it is against the manifest weight of the evidence. In re Austin W., 214 Ill. 2d 31, 51-52, 823 N.E.2d 572, 585 (2005).

"It is well settled that a parent has superior rights to the care and custody of a child, unless the child is placed elsewhere due to an adjudicated finding that the parent abused or neglected the child." In re Alicia Z., 336 Ill. App. 3d 476, 498, 784 N.E.2d 240, 256 (2002), citing In re J.J., 327 Ill. App. 3d 70, 77, 761 N.E.2d 1249, 1255 (2001); In re S.S., 313 Ill. App. 3d 121, 132, 728 N.E.2d 1165, 1174 (2000). While a natural parent has a superior right to the custody of her child, "that right is not absolute and must yield to the best interests of the child." In re J.K.F., 174 Ill. App. 3d 732, 733, 529 N.E.2d 92, 93 (1988). The presumption that the "right or interest of a natural parent in the care, custody[,] and control of a child is superior to the claim of a third person" is only one of several factors used by the court to determine the best interest of the child. In re Custody of Townsend, 86 Ill. 2d 502,

508, 427 N.E.2d 1231, 1234 (1981). "A court need not find that the natural parent is unfit or has forfeited his custodial rights before awarding custody to another person if the best interests of the child will be served." Townsend, 86 Ill. 2d at 508, 427 N.E.2d at 1234. The best interest of the child is the paramount consideration in all custody and guardianship cases and takes precedence over a natural parent's superior right to custody. In re Violetta B., 210 Ill. App. 3d 521, 533, 568 N.E.2d 1345, 1352 (1991).

While a trial court may determine that it is in a minor's best interest to place custody of that minor with someone other than a "fit" biological parent, the court must comply with section 2-28 of the Juvenile Act. 705 ILCS 405/2-28 (West 2004). Because the trial court failed to comply with many aspects of section 2-28 of the Juvenile Act, we reverse and remand.

Section 2-28 of the Juvenile Act provides for court review of the proceedings of abused, neglected, and dependent minors. 705 ILCS 405/2-28 (West 2004). Subsection 2 of section 2-28 of the Juvenile Act describes the trial court's role at a permanency hearing. 705 ILCS 405/2-28(2) (West 2004). At a permanency hearing, the court must determine the future status of the child and select one of eight enumerated permanency goals. 705 ILCS 405/2-28(2) (West 2004). At the conclusion of the hearing, the court must enter a written order setting forth that goal. 705 ILCS 405/2-28(3) (West 2004). The first five permanency goals are as follows:

"(A) The minor will be returned home by a

specific date within 5 months.

(B) The minor will be in short-term care with a continued goal to

return home within a period not to exceed one year, where the

progress of the parent or parents is substantial giving particular consideration to the age and individual needs of the minor.

(B-1) The minor will be in short-term care with a continued goal to return home pending a status hearing. ***.

(C) The minor will be in substitute care pending court determination on termination of parental rights.

(D) Adoption, provided that parental rights have been terminated or relinquished.

(E) The guardianship of the minor will be transferred to an individual or couple on a permanent basis provided that goals (A) through (D) have been ruled out." 705 ILCS 405/2-28(2)(A) through (2)(E) (West 2004).

In this case, the trial court did not select any of the eight enumerated permanency goals. The section of the court's order that states the court considered the factors specified in section 2-28(2) and found a specific permanency goal was left blank. At the hearing when questioned by Kim's attorney, the court declined to set a goal, stating, "there is no goal as custody and guardianship have been--at this juncture been placed with Ms. Faulkner."

Further, in selecting one of the eight goals, the trial court must indicate in writing the reasons the goal was selected and why the preceding goals were ruled out. 705 ILCS 405/2-28(2) (West 2004). Section 2-28(2) of the Juvenile Act specifically states that if the court selects private guardianship as a goal, the court must rule out the preceding five permanency goals (return home within five months, return home within one year, return

home pending a status hearing, substitute care pending termination of parental rights, and adoption) and indicate its reasons for ruling out the goals. When the court failed to select a goal, the court also failed to rule out the first five goals and provide reasons for doing so.

Finally, in setting a permanency goal that is in the best interest of the child, the trial court must consider the following factors:

"(1) Age of the child.

(2) Options available for permanence.

(3) Current placement of the child and the intent of the family regarding adoption.

(4) Emotional, physical, and mental status or condition of the child.

(5) Types of services previously offered and whether or not the services were successful and, if not successful, the reasons the services failed.

(6) Availability of services currently needed and whether the services exist.

(7) Status of siblings of the minor." 705 ILCS 405/2-28(2) (West 2004).

The court must also consider the permanency goal recommended by DCFS, the appropriateness of the services provided, the parties' efforts to achieve the goal, and the extent to which the goal has been achieved. 705 ILCS 405/2-28(2) (West 2004). In making its determination, the trial court seemed to rely heavily on only one factor, the child's emotional status.

˘ 17 ˘

The trial court failed to rule out the preceding permanency goals. Further, the evidence does not clearly indicate that the court had any reason to rule out the preceding goals. Because the court failed to set a permanency goal, failed to explain the goal it set, and failed to consider all of the factors enumerated to determine the minor's best interest, this court must reverse and remand. On remand, the trial court must select a permanency goal and explain the reasons for that goal.

We note that the evidence appears to support ruling out the goal of return home to Roemer. The trial court found Roemer unable to care for, protect, train, and discipline any of his children. Roemer does not have his own house and resides with his mother. The court further found that (1) Roemer's relationship with S.J.'s biological mother remained antagonistic, (2) Roemer admittedly and knowingly violated a court visitation order restricting visitation with his three oldest children, (3) he was indicated by DCFS for sexual abuse of his two daughters and stepdaughter, and (4) his ex-wife alleged S.J. was conceived by rape.

Ruling out the goal of return home to Kim, though, is not as clear. The trial court determined Kim was fit and able to care for three of her five children. As to the first child not returning to Kim, Kim's permanently damaged relationship with her oldest 17 1/2-year-old daughter, C.K., caused the court to find her unable to regain custody of C.K. As for the second child, S.J., the record indicates that the primary reason Kim was deemed unable to care for him was that the 2 1/2-year-old was bonded with Faulkner and recognized Faulkner as his primary caretaker. Such reasoning runs counter to the Juvenile Act and to the concept that parents have superior rights to the care and custody of their children. The fact that a child has developed a relationship with his custodian is irrelevant once the goal of

return home has been achieved. Even if parental rights have been terminated, the relationship with the custodian must yield to the rights of an adoptive parent, if one can be found. It is desirable that the child have some permanency in his life, regardless of his relationship with his custodian. For that reason, the goal of transfer of guardianship on a permanent basis is available only "provided that goals (A) through (D) [variations on return home or adoption] have been ruled out." 705 ILCS 405/2-28(2)(E) (West 2004).

The trial court determined Kim made reasonable efforts and progress in regaining custody of S.J. as she maintained employment, visited consistently, engaged in family counseling, and her drug tests were negative. The court only found Kim unable to care for S.J. The record shows, though, that Kim has visited with S.J. consistently since he was born. Before Faulkner intervened, the permanency goal was return home. Further, Kim was granted unsupervised weekend visits with S.J. In its order, the court determined continued, although limited, visitation between Kim and S.J. was in S.J.'s best interest. Further, Dr. Osgood suggested that expanded visitation between S.J. and his biological family would be appropriate when S.J. was around the age of five.

The practical effects of placing S.J. with Faulkner are also problematic. Placing S.J. with Faulkner effectively removes DCFS's involvement, leaving Faulkner, Kim, Roemer, and presumably the court to work out visitation until one of the following occurrences: (1) S.J. turns 18, (2) Faulkner decides she no longer wants to care for S.J., or (3) S.J. is returned to Kim. The "purpose" section of the Juvenile Act states that a goal of the Act is to achieve permanency at the "earliest opportunity" for the subject children. 705 ILCS 405/1-2 (West 2004). Placing S.J. with Faulkner appears to be inconsistent with this goal.

## III. CONCLUSION

For the reasons stated, we reverse the trial court's judgment and remand for further proceedings.

Reversed and remanded.

TURNER, P.J., concurs.

McCULLOUGH, J., specially concurs.

JUSTICE McCULLOUGH, specially concurring:

I agree with the necessity to remand to the trial court for the purpose of following the mandates of the Juvenile Act and in particular section 2-28(2).

I write specially only to indicate my disagreement with the disposition's reviewing and determining the importance of some of the evidence. Excepting our conclusion at the close of the disposition, I refer to the last two to three pages of the opinion, which review some of the evidence presented. I believe we made clear the reasons for remand. It is not necessary, nor should it be our prerogative, to prejudge and weigh the evidence presented. In the first instance, that is the responsibility and prerogative of the trial judge.