NOTICE

Decision filed 07/15/10. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NO. 5-10-0091

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| *In re* T.S., a Minor | ) Appeal from the |
| | ) Circuit Court of |
| (The People of the State of Illinois, | ) Randolph County. |
| | ) |
| Petitioner-Appellee, | ) |
| | ) |
| v. | ) No. 08-JA-14 |
| | ) |
| Catherine Johnson, | ) Honorable |
| | ) William A. Schuwerk, Jr., |
| Respondent-Appellant). | ) Judge, presiding. |

_____

JUSTICE WEXSTTEN delivered the opinion of the court:

The respondent, Catherine Johnson, appeals from the Randolph County circuit court's order placing the custody and guardianship of her daughter, T.S., with T.S.'s half-sister's father, Javier Q. Javier and the respondent are the biological parents of T.S.'s half-sister, C.Q., but Javier is not T.S.'s biological father. We reverse and remand.

BACKGROUND

On September 25, 2008, the State filed a petition for an adjudication of wardship on behalf of six-year-old T.S. and two-year-old C.Q., seeking to obtain the guardianship and custody of the children from their mother, the respondent. The petition filed on behalf of C.Q. is not at issue here. In T.S.'s petition, the State alleged that T.S. was dependent because C.Q. suffered serious multiple bruising to her buttocks and T.S. was unable to protect herself. The petition averred that it was in the best interest of T.S. for her to be adjudged a ward of the court.

The same day, the court held a shelter-care hearing on behalf of both C.Q. and T.S.

1

Karen Holtz, a Department of Children and Family Services (DCFS) investigator, testified that on September 23, 2008, she responded to a call from the police alleging that a child had cuts, welts, and bruises. She testified that she observed severe bruising on C.Q.'s buttocks, contacted her manager, and was approved to take protective custody of C.Q. and T.S. from the police.

Janice Barbour, a detective captain with the Randolph County sheriff's office, testified that she received a call on September 23, 2008, stating that there was some bruising on C.Q.'s buttocks. She testified that she went to C.Q.'s babysitter's house and that the respondent arrived at the house while she was there. She testified that she asked the respondent where C.Q.'s bruising had come from and that the respondent told her that it could have come from C.Q. falling or from C.Q.'s babysitter spanking her one time the previous week. She testified that she also asked C.Q. where the bruising had come from and that C.Q. told her "that her mommy hit her because she had peed on herself." She testified that when she asked the respondent why C.Q. would tell her that the respondent had spanked her when the respondent said it had come from somebody else, she stated that C.Q. "is a storyteller." She testified that she also asked T.S. about C.Q.'s bruises and she related T.S.'s response: "[H]er mom had hit [C.Q.] with a belt because she had peed on herself." She testified that in her opinion it was not safe to leave C.Q. or T.S. with the respondent and that is why the children were taken into protective custody.

Following the hearing, the court entered an order for temporary custody and guardianship, finding that probable cause existed to believe that T.S. was a minor who was abused, neglected, or dependent and directing that T.S. be placed in the temporary custody of DCFS until October 15, 2008. C.Q. was also placed in the temporary custody of DCFS. DCFS thereafter placed T.S. and C.Q. with C.Q.'s father's mother, Donna Q. The court appointed T.S. a guardian *ad litem* (GAL), and the respondent was appointed counsel. On

October 2, 2008, the court entered an order appointing a representative from Court Appointed Special Advocates (CASA) to represent T.S.

On October 15, 2008, an adjudicatory hearing was held. At that hearing, the only witnesses to testify were (1) Amie Klausing, C.Q. and T.S.'s babysitter, and (2) DCFS investigator Karen Holtz. Amie testified that while babysitting C.Q. on September 22, 2008, she noticed bruising on C.Q.'s buttocks while helping her use the restroom and that, as a result, her husband called DCFS and reported the bruising. Karen gave essentially the same testimony that she gave previously at the shelter-care hearing (*i.e.*, that she observed severe bruising on C.Q.'s buttocks and took protective custody of C.Q.) but also testified that the respondent did not have an answer to the question of why she did not report the bruising to DCFS or to the police out of concern for C.Q.'s safety when she noticed the bruising. Following this testimony, the court found that the State had proven its petition in the cases of both C.Q. and T.S. The court then ordered DCFS and Catholic Social Services of Southern Illinois (CSS) to complete a predispositional report. The dispositional hearing was set for November 14, 2008.

On November 13, 2008, CSS submitted a case summary to the court. The summary indicated that both T.S. and C.Q. had been placed with a relative–C.Q.'s paternal grandmother, Donna. It also set forth a service plan for the respondent, T.S., Javier (C.Q.'s biological father), and Justin S. (T.S.'s biological father). It recommended that DCFS receive the guardianship of T.S. and C.Q. and that Javier receive the physical custody of the minors since the allegation of abuse was not against him.

On November 20, 2008, a dispositional hearing was held. At the hearing, prior to any evidence being presented, the respondent stipulated to T.S. and C.Q. becoming wards of the court and to custody and guardianship being awarded to DCFS. The only witness to testify was Emily Toenjes, CSS's foster care worker for T.S. and C.Q. and the author of the CSS

3

case summary. Emily testified that the respondent had been cooperating with her service plan, that there was nothing that the respondent was doing incorrectly, that when the respondent visits with the children, the children miss her when they leave, that Javier had a service plan whereby he has to complete a substance abuse and domestic violence assessment, that she has been unable to get in contact with Justin despite multiple attempts to do so, that she would estimate a five-month time frame to complete the service plan, and that the goal should be for the children to return home in five months. The court also asked Javier and Justin if they had any objections to custody being given to DCFS. Both replied that they did not.

Following the dispositional hearing, the court entered an order finding that it was in the best interest and welfare of T.S. and the public for T.S. to be adjudged a ward of the court, finding that both the respondent and Justin were unable, for some reason other than financial circumstances alone, to care for, protect, train, or discipline T.S., and ordering that T.S. be placed in the custody and guardianship of DCFS. The court set the case for a permanency hearing on May 20, 2009.

On May 12, 2009, CASA volunteer Michelle Nellis filed a case report on behalf of both T.S. and C.Q. In that report, Michelle indicated that the respondent's progress on her service plan was satisfactory but incomplete, that Javier's progress was satisfactory and complete, and that Justin's progress was unsatisfactory. The report recommended that custody and guardianship remain with DCFS, that the respondent complete her service plan and have increased supervised visitation, and that Javier continue with unlimited, unsupervised visitation. The report summarized its report with regard to T.S. as follows:

"[T.S.] has specifically told CASA that she is happy living at Javier or Donna's house, but she wants to 'come home to mom.' This CASA [representative] has observed a change in [T.S.'s] behavior since the last court date. [T.S.] appears to be

4

withdrawn and quiet. *** CASA's other concern is that [T.S.] may be feeling second to [C.Q.], since [T.S.] often says 'Jav isn't my dad, he's [C.Q.'s] dad.' "

On May 20, 2009, CSS filed a case summary with the court. In that summary, CSS noted that Javier had completed his service plan, that no further recommendations were made with regard to Javier, and that CSS had attempted to contact Justin by phone but no response had been received. The following was written with regard to the respondent's progress with her service plan:

"[The respondent] has worked at Perry Oaks Rehab and Nursing for about nine months. [The respondent] is a CNA at Perry Oaks Rehab and Nursing Center.

[The respondent] has been attending [s]ubstance [a]buse [t]reatment at Human Service Center. [The respondent] has been attending parenting classes at Human Service Center. According to Pam Jackson, clinician, [the respondent] has participated in group but is unsure if [the respondent] realizes the significance of having her children removed from her care.

[The respondent] received a psychiatric evaluation completed on February 17, 2009[,] by Dr. Gupta from Human Service Center. It was recommended that [the respondent] receive counseling. [The respondent] cancelled her follow[-]up appointment with Dr. Gupta twice.

A mental health assessment was completed on January 13, 2009[,] where [the respondent] was diagnosed with [g]eneralized [a]nxiety [d]isorder.

[The respondent] has not admitted to the alleged allegation which brought her children into care.

[The respondent] interacts well with her children. There is some concern regarding supervision during [the respondent's] visits because [T.S.] recently told [the] supervisor and worker that her favorite thing to do at mom's is to ride her bicycle

5

in the street and down the hill by herself. Charlotte Johnson is currently supervising [the respondent's] visits. When [T.S.] was asked who supervised her while she was outside, she said a neighbor boy but could not recall his name."

CSS recommended that Javier receive physical custody of T.S. and C.Q. and that aftercare begin. The summary provided the following reasoning for its recommendations:

"Worker realizes that [T.S.] is not biologically related to Javier Q[.][;] however, [Javier] has been [T.S.'s] father figure for the past three and a half years. [Javier] provides a safe, secure, loving home environment.

[T.S.] has spent the majority of her time in foster care at Javier Q[.]'s home with [C.Q.] [T.S.] is attached to Javier, his girlfriend[,] and his girlfriend's daughter.

It is also important to keep [T.S.] and [C.Q.] together because they are attached to one another and love each other. [T.S.] and [C.Q.] have been together since [C.Q.] was born[;] therefore they should not be separated. This worker and worker's supervisor feel that [the respondent] cannot adequately care for [T.S.] and that she will be better taken care of and protected with Javier Q[.]"

On May 20, 2009, a permanency review hearing was held. At that hearing, Emily testified that Javier had completed his service plan; that the respondent was making satisfactory progress with her service plan; that the respondent had not completed her individual counseling, her follow-up appointment with her psychiatrist, her parenting classes, or her substance abuse treatment; that the respondent had not refused to do anything; that she was not happy with the CASA representative because she is "supposed to be looking out for the welfare of the kids, but she hasn't been to the foster home and that's where they reside"; and that her goal was for Javier to receive custody and for aftercare to be started. On cross-examination, she testified that the respondent lives in a mobile home, is employed as a CNA, had a babysitter in place should she reobtain custody of her children, and had begun all the

components required by her service plan but had not completed them. She testified that she thought that the service plan should be completed in two to three months and that her recommendation was for the custody of both T.S. and C.Q. to be awarded to Javier despite the fact that T.S. is not Javier's child "[b]ecause Javier *** has been a father figure in [T.S.'s] life." She testified that Javier considers himself T.S.'s father, that Justin and a few of the respondent's family members have expressed a desire to have the custody of T.S., that she thought that Javier would be a better placement for T.S. than one of the respondent's family members because it would keep T.S. and C.Q. together, that T.S. is attached to Javier, and that T.S. considers Javier and his family her family. She testified that she had seen T.S. and C.Q. interact at Javier's home on approximately three occasions and that she was asking for custody and guardianship to remain with DCFS and for an aftercare plan to continue on Javier's behalf.

Michelle, T.S.'s and C.Q.'s CASA representative, testified that she had been to Javier's house one time, that she saw the children interact, that she had been to the respondent's house, that the respondent had come a long way, that she and Emily had different opinions, that she had yet to visit Donna's home, that she had been present during some of the visits between the respondent and her children and that they went well, that the respondent and her children were affectionate with each other and played games together, that the respondent's current visitation schedule was from 11 a.m. to 1 p.m. on Saturdays, that she believed that it was in the best interest of the children to increase the respondent's visitation, that she recommended that the visits be moved to unsupervised, that "[T.S.] ha[d] told [her] that she's happy living with Javier at Donna's, but she would like to come home," and that T.S. had made remarks to her to indicate to her that T.S. does not feel that she is as important as C.Q.

After the evidence had been presented, Eric Rieckenberg, T.S.'s and C.Q.'s GAL, stated the following to the court:

7

"Your Honor, on February 26, 2009, I visited the home of Donna Q[.], the foster–actually, the natural father's mother. The home appeared to be neat and well-kept. I interviewed the child[ren] privately. They appeared to be happy in their placement given the limited interview ability of the–given the fact that they're very young children. I was also taken to the home of the natural father, Javier Q[.] He was at work at that time. Again, the home appeared to be neat with no sanitary or other hazards present. Again, the children seemed to be–when I met with them, seemed to be well-adjusted to their current placement."

The court then stated the following:

"Okay. Okay. The [c]ourt's reviewed the reports by CASA and by [CSS], heard testimony and narration by Mr. Rieckenberg, the GAL. The [c]ourt feels that it's in the best interest of both these minors that guardianship remain with [DCFS] at this time with the permanency goal of return home. And I'm going to order that both–it seems that [Justin] is not very interested. He's not done anything with regards to a service plan. He's not even come to court here, so he's still a factor in this case, but as time goes by, he becomes less and less of a factor. Permanency goal return home.

Now, the question[] is[,] [W]hose–whose home? At this time it's pretty clear to me, you know, [Javier] had pretty well completed his service plan six months ago, the way I remember this. And [the respondent] was just getting started with her service plan, although this case goes back a ways. And since then there's been also a new file open on [B.J.], [the respondent's] newest baby, which we're due to have a dispositional hearing on after this.

The [c]ourt feels it's in the best interest of [T.S.] and [C.Q.] that these two children remain together. They've been as brother and sister their whole life, and

from my reading of the case and the testimony of the evidence, Javier has been, I guess, the only father that [T.S. has] known. Or she's known. I'm saying he, she. And so I think it's in the children's best interest that these two children stay together. And there's no reason not to grant custody of [C.Q.] and [T.S.] to [Javier] at this time. DCFS is still going to have legal guardianship."

Following the permanency hearing, the court entered a permanency order finding that the respondent had made substantial progress toward the return home of T.S. but that Justin had not. The court awarded the custody of T.S. to Javier, ordered that the guardianship of T.S. remain with DCFS, and awarded the respondent unsupervised visitation from 10 a.m. Saturday to 10 a.m. Monday every other weekend. The court found that the permanency goal was for T.S. to return home within 12 months, and the court ordered that the respondent continue to cooperate with DCFS or any private agency assigned, cooperate with the service plan and prior court orders, and correct the conditions which caused the placement of T.S. A permanency review hearing was scheduled for December 2, 2009.

On December 2, 2009, CSS filed a case summary with the court. The summary noted the following with regard to the respondent's service plan progress:

"[The respondent] has been attending [s]ubstance [a]buse [t]reatment at Human Service Center. During a family meeting on November 25, 2009, [the respondent] stated that she completed parent education last week. Worker has tried to get in contact with Pam Jackson, Human Service Center, but has not heard back from her."

It also noted, as it did previously in the May 20, 2009, case summary, that Dr. Gupta had recommended that the respondent receive counseling, that the respondent had twice cancelled her follow-up appointments with Dr. Gupta, and that a follow-up session had been scheduled for December 1, 2009. The following recommendation was given to the court:

"Worker recommends that Javier Q[.] receive guardianship of [T.S.] and [C.Q.]

9

The family has proven time and time again that they love [T.S.] and accept her as a member of their family. Worker realizes that [T.S.] is not biologically related to Javier Q[.][;] however, [Javier] has been [T.S.'s] father figure for the past four years. [Javier] provides a safe, secure, loving home environment. [T.S.] has spent the majority of her time in foster care at Javier Q[.]'s home with [C.Q.] [T.S.] is attached to [C.Q.], Javier, his fiancé [*sic*][,] and his fiancé's [*sic*] daughter."

On December 2, 2009, the court held a permanency review hearing. Emily was the only witness the State called to testify. Emily testified that Justin had done nothing toward meeting the goals of his service plan other than take an integrated assessment over the phone because he was unable to meet with her in person, that he had not had any visitation with T.S., and that he had done nothing toward getting visitation other than ask for it. She testified that the respondent was doing what she was supposed to be doing; that the respondent had just reported to her that she had finished her parenting education about a week and a half to two weeks previously; that she called the Human Service Center to confirm the respondent's report but no one had not yet returned her calls; that the respondent had her follow-up appointment with Dr. Gupta later that day; that the respondent stated that she completed her substance abuse treatment but that this also had yet to be confirmed by the Human Service Center; that assuming that the respondent had completed her parenting and substance abuse classes and met with Dr. Gupta for her follow-up, she would have completed her service plan (besides individual counseling, which was ongoing); that she was recommending that Javier receive guardianship and permanent custody and that T.S. and C.Q.'s cases be closed; and that she was asking the court to change the permanency goal of a return home within 12 months to a guardianship with Javier. On cross-examination, she testified that she was aware that Javier was a convicted felon; that as far as she knew, relative to DCFS protocols, a convicted felon was allowed to take guardianship over a minor child;

10

that she was not aware of any law that prevented a convicted felon from becoming a guardian; that she would not change her opinion even if there were such a law; that when she wrote her case summary, everything the respondent was supposed to complete under her service plan was not done and it still had not been confirmed that the respondent had completed her service plan; that the respondent had passed all of her drug tests recently; that the respondent had been completing counseling with the Human Service Center relative to her substance abuse issues; that when writing the case summary, the fact that the respondent had not completed her service plan was something she considered; and that even if the respondent had completed her service plan, it would not change her recommendation to have guardianship given to Javier. She explained: "[Even though] he's not biologically related to her, *** he has been considered her family for many years. He's been living with her for almost the past nine months or so. [T.S.] is happy there. She's safe. She's doing very good in school. She has friends."

Following Emily's testimony, the court then called the respondent as a witness. The respondent testified that she had completed her psychiatric evaluation on February 17, 2009, that she had a follow-up later that day with Dr. Gupta, that B.J. was born in March, that as a result of B.J. being born she got a new service plan through CSS about a month prior to her testimony, and that she had seen her substance abuse counselor the prior day. The court then continued the hearing until December 21, 2009, so that the GAL, who was not present, could testify and so that Emily could verify whether the respondent had completed her service plan.

On December 21, 2009, CSS filed another case summary dated December 18, 2009. This summary again noted that CSS had been unable to contact Karen Grace to determine if the respondent had completed her parental education requirement. It also noted that the respondent attended her follow-up session on December 2, 2009, with Dr. Gupta. It indicated that Dr. Gupta found that the respondent did not have a mental health diagnosis.

11

It also noted that the respondent had her last counseling appointment on January 20, 2010, and stated that the respondent was "cooperating with [CSS] and ha[d] completed most of her service plan at this time." Nevertheless, CSS gave the same recommendation that was given in the December 2, 2009, case summary, *i.e.*, that Javier receive the guardianship of T.S.

On December 22, 2009, a permanency review hearing was held for C.Q. and T.S. The only witness to testify was Emily. Emily testified that in her case summary dated December 18, 2009, she indicated that she was asking for the custody and guardianship of T.S. to be awarded to Javier, that neither she nor anyone on behalf of DCFS had completed a legal screening to effectuate that goal, and that it was not her understanding that a prospective guardian must submit for a legal screening before DCFS could recommend a guardian other than the natural parent.

Following Emily's testimony, the court stated with regard to T.S. and C.Q., "[I]t's going to be the order of the [c]ourt that guardianship and custody be awarded to Javier Q[.] at this time." The court appears to have based its decision on the fact that DCFS's goal had been completed:

> "We don't keep the case open once the DCFS says, you know, they've reached the goal. DCFS says they've reached the goal with regards to Mr. Q[.] I–if you got two parents, you can't–you can't give the kids to both of them. They don't live together. So the case is going to get terminated sooner or later."

The respondent then objected, based upon the fact that Javier was not T.S.'s biological father, and noted that it was her understanding that a legal screening must be completed through DCFS before Javier could be appointed as the guardian. The court acknowledged that it knew that Javier was not T.S.'s biological father, and it responded to the latter argument by stating the following: "Are you telling me the [c]ourt's bound by–DCFS has to have a legal screen before I can rule on and enter an order? No."

12

Following the permanency hearing, the court entered an order finding that Javier had successfully completed his service plan and that it was in the best interest of T.S. that Javier be appointed as the guardian. Accordingly, the court appointed Javier as T.S.'s guardian and awarded Javier full custody. The court also ordered that the respondent be awarded unsupervised visitation with T.S. every other weekend from Friday at 6 p.m. until Sunday at 6 p.m. and at any other time as mutually agreed between the parties. On January 19, 2010, the respondent filed a motion to reconsider the court's order awarding the custody and guardianship of T.S. to Javier.

On January 20, 2010, the court entered an order denying the respondent's motion to reconsider. In that order, the court made the following findings:

"Javier Q[.] has custody of his natural daughter by [the respondent]. [T.S.] and [C.Q.] are sisters and Javier Q[.] has been the father figure for both minors and has had custody of them for the past four years. Emily Toenjas [*sic*], [f]oster [c]are [c]ase [m]anager for [CSS], has recommended that Javier Q[.] receive custody and guardianship of [T.S.], and it is the best interest of [T.S.] and [C.Q.] that they remain united in the same household. The natural mother, [the respondent], has not completed her service plan. A third minor child of [the respondent], [B.J.], remains in the custody of [DCFS]. It is in the best interest of [T.S.] that Javier Q[.] be appointed guardian and custodian of [T.S.]"

On February 18, 2010, the respondent filed her timely notice of appeal.

ANALYSIS

The Juvenile Court Act of 1987 (the Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2008)) "is a statutory scheme, created by the legislature, the purpose of which is to secure for each minor subject thereto the care and guidance which will best serve the minor's safety and moral, emotional, mental[,] and physical welfare[] and the best interests of the

13

community." *In re Austin W.*, 214 Ill. 2d 31, 43 (2005); 705 ILCS 405/1-2 (West 2008). Section 2-28 of the Juvenile Court Act "requires the trial court to establish a permanency goal that is in the best interest of the child." *In re E.I.*, 309 Ill. App. 3d 392, 397 (1999); 705 ILCS 405/2-28 (West 2008). "When reviewing the trial court's best-interest determination, the reviewing court will not overturn the court's determination unless it is against the manifest weight of the evidence." *In re S.J.*, 364 Ill. App. 3d 432, 441 (2006).

While a trial court may determine that it is in a minor's best interest to place the custody of that minor with someone other than a biological parent, the court must comply with section 2-28 of the Juvenile Court Act and first rule out any return-home possibilities. See *In re S.J.*, 364 Ill. App. 3d at 442; 705 ILCS 405/2-28 (West 2008). "Section 2-28 of the Juvenile [Court] Act provides for court review of the proceedings of abused, neglected, and dependent minors." *In re S.J.*, 364 Ill. App. 3d at 442; 705 ILCS 405/2-28 (West 2008). Whether the trial court complied with section 2-28 of the Juvenile Court Act is a matter of statutory construction. Thus, our review is *de novo*. *In re Mary Ann P.*, 202 Ill. 2d 393, 404 (2002); *In re M.G.*, 313 Ill. App. 3d 871, 874 (2000).

"The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature." *In re Mary Ann P.*, 202 Ill. 2d at 405. "The most reliable indicator of the legislature's intent is the language used in the statute, which must be given its plain and ordinary meaning." *In re Mary Ann P.*, 202 Ill. 2d at 405. "Where the statutory language is clear and unambiguous, it will be given effect without resort to other aids of construction." *In re Mary Ann P.*, 202 Ill. 2d at 405.

"Subsection 2 of section 2-28 of the Juvenile [Court] Act describes the trial court's role at a permanency hearing." *In re S.J.*, 364 Ill. App. 3d at 442; 705 ILCS 405/2-28(2) (West 2008). The relevant part of that section provides as follows:

"At the permanency hearing, the court shall determine the future status of the

14

child. The court shall set one of the following permanency goals:

(A) The minor will be returned home by a specific date within 5 months.

(B) The minor will be in short-term care with a continued goal to return home within a period not to exceed one year, where the progress of the parent or parents is substantial giving particular consideration to the age and individual needs of the minor.

(B-1) The minor will be in short-term care with a continued goal to return home pending a status hearing. When the court finds that a parent has not made reasonable efforts or reasonable progress to date, the court shall identify what actions the parent and the Department must take in order to justify a finding of reasonable efforts or reasonable progress and shall set a status hearing to be held not earlier than 9 months from the date of adjudication nor later than 11 months from the date of adjudication during which the parent's progress will again be reviewed.

(C) The minor will be in substitute care pending court determination on termination of parental rights.

(D) Adoption, provided that parental rights have been terminated or relinquished.

(E) The guardianship of the minor will be transferred to an individual or couple on a permanent basis provided that goals (A) through (D) have been ruled out.

* * *

In selecting any permanency goal, the court shall indicate in writing the reasons the goal was selected and why the preceding goals were ruled out." 705 ILCS

15

405/2-28(2) (West 2008).

In *In re S.J.*, a case involving the permanency placement of a child at a permanency review hearing absent a termination of parental rights, the circuit court changed the permanency goal of a return home within five months and found that it was in S.J.'s best interest for custody and guardianship to be placed with S.J.'s foster mother. In the circuit court's order, however, the trial court failed to set a permanency goal, stating, " '[T]here is no goal as custody and guardianship have been–at this juncture been placed with [S.J.'s foster mother].' " *In re S.J.*, 364 Ill. App. 3d at 443. "When the court failed to select a goal, the court also failed to rule out the first five goals and provide reasons for doing so." *In re S.J.*, 364 Ill. App. 3d at 443. The respondents, S.J.'s biological parents, appealed, and the appellate court reversed and remanded for the circuit court's failure to comply with section 2-28 of the Juvenile Court Act. *In re S.J.*, 364 Ill. App. 3d at 444. The court ordered the circuit court on remand to select a permanency goal and explain the reasons for that goal. *In re S.J.*, 364 Ill. App. 3d at 444.

Here, like in *In re S.J.*, the trial court failed to comply with many aspects of section 2-28 of the Juvenile Court Act. At the first permanency hearing on May 20, 2009, the trial court set the permanency goal for T.S. to return home pursuant to subsection (2)(B) of section 2-28 of the Juvenile Court Act (705 ILCS 405/2-28(2)(B) (West 2008)), *i.e.*, short-term care with a continued goal to return home within a period not to exceed one year. At the hearing, however, the trial court appears to have been confused regarding the goal of a return home, stating, "Now, the question[] is[,] *** [W]hose home?" By asking this question, the trial court implicated that a return home could mean either (1) a return home to the respondent or (2) a return home to Javier, who was not T.S.'s biological father. We find the answer to this question obvious: a return home means a return home to the respondent, T.S.'s mother, where T.S. was living prior to being removed from her home.

Javier was not T.S.'s guardian or custodian prior to T.S. being removed from the respondent's home, and from the record it does not appear that T.S. ever lived in Javier's home prior to custody and guardianship being taken from the respondent. For the trial court to grant Javier guardianship and custody on a permanent basis, it first has to rule out the permanency goal of a return home to the respondent or adoption (provided that T.S.'s parents' rights were terminated or relinquished). See 705 ILCS 405/2-28(2) (West 2008). That did not occur here. The trial court cannot magically pull a rabbit out of a hat and replace Javier's home for the respondent's home.

Not only that, the trial court also erred in leaving blank the section in the form permanency order where the trial court was supposed to provide in writing why the permanency goal was selected and why the preceding goals were ruled out. This is not an optional requirement, and the trial court erred in not providing its reasoning for the goal and why subsection (2)(A) was ruled out. 705 ILCS 405/2-28(2) (West 2008) ("In selecting any permanency goal, the court *shall* indicate in writing the reasons the goal was selected and why the preceding goals were ruled out" (emphasis added)). The supreme court has construed "shall" "as a clear expression of legislative intent to impose a mandatory obligation," and the trial court was not free to ignore this mandate. *People v. O'Brien*, 197 Ill. 2d 88, 93 (2001); see, *e.g.*, *Village of Winfield v. Illinois State Labor Relations Board*, 176 Ill. 2d 54, 64 (1997); *People v. Thomas*, 171 Ill. 2d 207, 222 (1996); *In re James S.*, 388 Ill. App. 3d 1102, 1107 (2009); *In re Williams*, 305 Ill. App. 3d 506, 510 (1999).

Further, on December 2, 2009, at the permanency review hearing, T.S.'s foster care worker asked the court to change the permanency goal of a return home within 12 months to a guardianship with Javier. The court then continued the hearing so that T.S.'s foster care worker could verify regarding whether the respondent had completed her service plan and so that T.S.'s GAL could testify. On December 22, 2009, however, the permanency review

17

hearing was held, but T.S.'s GAL was not present to testify, nor had T.S.'s foster care worker verified whether the respondent had completed her service plan. Despite this, the court entered an order appointing Javier as T.S.'s guardian and awarding him full custody of T.S. In entering this order, the court did not utilize the form permanency order that it had utilized previously. It appears, however, that the court changed the permanency goal from subsection (2)(B) to subsection (2)(E), *i.e.*, "[t]he guardianship of the minor will be transferred to an individual or couple on a permanent basis provided that goals (A) through (D) have been ruled out" (705 ILCS 405/2-28(2)(E) (West 2008)). As with the previous permanency order filed on May 20, 2009, the court again erred in failing to indicate in writing the reasons the goal was selected and why the preceding goals were ruled out. Moreover, the preceding goals were not ruled out. This was error, and the court's order is reversed and the cause is remanded. On remand, the trial court is directed to comply with section 2-28 of the Juvenile Court Act.

We also note that pursuant to section 2-28, the public agency that is the guardian or custodian of the minor–here, CSS–shall ensure "at least 14 days in advance of the hearing" that all the parties to the permanency hearings are provided a copy of (1) the most recent service plan prepared within the prior six months and (2) a report detailing "what progress or lack of progress the parent has made in correcting the conditions requiring the child to be in care[,] whether the child can be returned home without jeopardizing the child's health, safety, and welfare[] and[,] if not, what permanency goal is recommended to be in the best interests of the child[] and why the other permanency goals are not appropriate." 705 ILCS 405/2-28(2) (West 2008). Here, the court held permanency hearings on May 20, 2009, December 2, 2009, and on December 22, 2009. On either the day of the hearing or the day prior to the hearing, CSS filed its mandatory report with the court and presumably with the parties. Without going into the details of these reports, we note that they are untimely filed

and are deficient in detailing one or more of the requirements set out in section 2-28 of the Juvenile Court Act. Had these reports been timely filed, perhaps the respondent could have obtained the requisite verification needed to prove that she had completed her service plan as she claimed.

Nonetheless, we fail to see any reasonable excuse for CSS's failure to verify whether the respondent had completed her service plan in this case. At the December 2, 2009, permanency review hearing, the trial court continued the hearing so that T.S.'s GAL could testify and so that CSS could verify whether the respondent had completed her service plan. The court set the permanency review hearing for 20 days later, and when the hearing was continued on December 22, 2009, still the GAL was not present to testify and CSS had not verified whether the respondent had completed her service plan. Nevertheless, the court entered an order finding that DCFS and CSS's goal had been reached, and the court awarded guardianship and custody to Javier. The court appears to have made this decision solely on the testimony of CSS's foster care worker. Neither T.S.'s GAL nor her CASA representative testified at this hearing, and although CSS indicated in its report that it had been unable to verify whether the respondent had completed her service plan, no explanation had been provided for why CSS was not able to verify this information in the 20-day period between the two permanency review hearings. We find this unacceptable. Because many provisions of section 2-28 of the Juvenile Court Act were not complied with, we reverse and remand for a new permanency hearing where T.S.'s GAL, CASA representative, and foster care worker can testify and where CSS can file a report in compliance with section 2-28 that also explains whether the respondent has completed her service plan.

## CONCLUSION

For the foregoing reasons, the judgment of the Randolph County circuit court is reversed, and the cause is remanded for proceedings not inconsistent with this decision.

Reversed; cause remanded.

WELCH and CHAPMAN, JJ., concur.

NO. 5-10-0091

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| *In re* T.S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Randolph County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 08-JA-14 |
| | ) | |
| Catherine Johnson, | ) | Honorable |
| | ) | William A. Schuwerk, Jr., |
| Respondent-Appellant). | ) | Judge, presiding. |

---

**Opinion Filed**:          July 15, 2010

---

**Justices**:          Honorable James M. Wexstten, J.

Honorable Thomas M. Welch, J., and
Honorable Melissa A. Chapman, J.,
Concur

---

**Attorney for Appellant**          Jeremy R. Walker, Randolph County Public Defender, 139 S. Main Street, P.O. Box 8, Red Bud, IL 62278

---

**Attorneys for Appellee**          Hon. Randall Rodewald, State's Attorney, Randolph County Courthouse, Chester, IL 62233; Patrick Delfino, Director, Stephen E. Norris, Deputy Director, Kendra S. Peterson, Staff Attorney, Office of the State's Attorneys Appellate Prosecutor, Fifth District Office, 730 E. Illinois Highway 15, Suite 2, P.O. Box 2249, Mt. Vernon, IL 62864

---